**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KEYBANK NATIONAL ASSOCIATION,

        Plaintiff,

-against-

FRANKLIN ADVISERS, INC., *et al.*,

        Defendants.

Adv. Pro. No.:  19-01104-mew
(Consolidated with 19-01105-mew)

Hon. Michael E. Wiles

FIFTH THIRD BANK,

        Plaintiff,

-against-

FRANKLIN ADVISERS, INC., *et al.*,

        Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff KeyBank National Association (***"KeyBank"*** or ***"Plaintiff"***), by and through its counsel, Reed Smith LLP, for its First Amended Complaint against each of the following defendants (i) Franklin Investors Securities Trust – Franklin Floating Rate Daily Access Fund, (ii) Franklin Floating Rate Master Trust – Franklin Floating Rate Master Series, (iii) Franklin Templeton Series II Funds - Franklin Floating Rate II Fund, (iv) Kansas Public Employees Retirement System, (v) Franklin Floating Rate Master Trust – Franklin Lower Tier Floating Rate Fund, (vi) Franklin Floating Rate Master Trust – Franklin Middle Tier Floating Rate Fund (the defendants referred to in clauses (i) through (vi) collectively are referred to as the ***"Franklin NM DIP Lenders"***), (vii) Franklin Templeton Series II Funds – Franklin Upper Tier Floating Rate Fund (the defendants referred to in clauses (i) through (vii) collectively are referred to as the ***"Franklin Lenders"*** or the ***"Franklin Lender Defendants"***), and (viii) Franklin Advisers, Inc.

(*"Franklin Advisers"*, and along with the Franklin Lenders, collectively, *"Franklin"* or the *"Defendants"*), hereby alleges as follows:

<u>Nature of Action</u>

1.      This is an action brought by Plaintiff KeyBank against the Defendants for breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference with contract, breach of fiduciary duty (against the Franklin Lenders), aiding and abetting breach of fiduciary duty (against Franklin Advisers) and declaratory judgment. The first three claims relate to the Defendants' breach of, and tortious interference with, a debtor-in-possession credit agreement in which the Plaintiff and the Defendants are co-lenders.  The fourth claim relates to the Franklin Lenders' breach of the fiduciary duties owed by them, as the controlling majority stockholder of a company, to the minority shareholders of that company, which include Plaintiff, by wrongfully using their controlling interest in an attempt to force Plaintiff to release its claims against Franklin upon execution of a stockholder agreement.  The fifth claim relates to Franklin Adviser's aiding and abetting the Franklin Lenders' breach of their fiduciary duties.  KeyBank also seeks declaratory judgment against the Defendants to enforce a sharing provision under the debtor-in-possession credit agreement that requires a *pro rata* distribution of payments (in cash or in the form of assumed loans) whenever any lender under the debtor-in-possession credit agreement receives a disproportionately large recovery from or on behalf of the borrower.

2.      Here, the aforementioned debtor-in-possession credit agreement and associated court order in the bankruptcy cases govern the rights of a forty-four (44)-member bank group, which documents provide numerous protections to ensure that all lenders are treated fairly. These protections were obtained through extensive negotiations among all the parties to the debtor-in-possession credit agreement, and were approved by the bankruptcy court in the bankruptcy cases.

3.     Recently, however, a subset of seven (7) of the larger lenders within that original forty-four (44) member bank group (which seven lenders (and their investment manager) are the Defendants in this action) have undertaken a course of improper conduct to undercut and breach numerous terms and protections provided under that debtor-in-possession credit agreement. Specifically, the Defendants proposed, initiated and implemented a new loan facility that triggers numerous defaults and breaches under the original debtor-in-possession credit agreement to which they are a party, and which new loan facility is being pursued by the Defendants to obtain a disproportionately larger recovery through an improper subordination of the original debtor-in-possession credit agreement, all of which actions are causing material injury and damages to KeyBank. The Defendants seek to eviscerate numerous provisions in the debtor-in-possession credit agreement (and the associated consent order) that protect KeyBank, which protections were obtained by KeyBank after extensive negotiations between all parties and which provisions are explicitly set forth in the debtor-in-possession credit agreement and consent order terms that were agreed upon by all parties. Accordingly, Plaintiff KeyBank is bringing this action to enforce its rights under the original debtor-in-possession credit agreement and related consent order and to assert inter-lender claims against the Defendants for breaching and acting to undermine the protections provided under the debtor-in-possession credit agreement.

## The Parties[1]

4.     Plaintiff KeyBank is a national association, with its principal place of business in Cleveland, Ohio.  KeyBank is one of the DIP Lenders.  As of March 29, 2018, Appvion, Inc. (*"Appvion"*) remained obligated to KeyBank for $15,471,250 of Roll-Up DIP Loans under the DIP Credit Agreement and certain swap obligations arising under the Prepetition Credit

---

[1] Capitalized terms used herein have the meanings ascribed to such terms in the General Allegations Section below.

Agreement/DIP Credit Agreement.    As of the date hereof, Appvion remains obligated to KeyBank for $15,471,250 of Roll-Up DIP Loans under the DIP Credit Agreement.

5.    Defendant Franklin Advisers, Inc. is registered as an investment adviser under the Investment Advisers Act of 1940, codified at 15 U.S.C. § 80b-1 through 15 U.S.C. § 80b-21, that managed and advised (and continues to manage and advise) at all applicable times relevant to this First Amended Complaint each of the Franklin Lender Defendants, including with respect to their capacities as DIP Lenders and/or New Priming DIP Lenders (each as defined herein). Defendant Franklin Advisers also advises additional mutual funds managed and/or controlled by it who hold Roll-Up DIP Loans. Defendant Franklin Advisers' principal place of business is located at One Franklin Parkway, San Mateo, California 94403.

6.    Defendant Franklin Investors Securities Trust – Franklin Floating Rate Daily Access Fund is a mutual fund launched by Franklin Resources, Inc. and managed by Franklin Advisers, Inc. that is regulated by the Investment Company Act of 1940. Defendant Franklin Investors Securities Trust – Franklin Floating Rate Daily Access Fund is a DIP Lender and is a New Priming DIP Lender (each as defined herein). As of March 8, 2018, Defendant Franklin Investors Securities Trust – Franklin Floating Rate Daily Access Fund held $30,211,102.80 of Roll-Up DIP Loans and, upon information and belief, held slightly less than $45,000,000 of NM DIP Loans. Through Franklin Advisers, Defendant Franklin Investors Securities Trust – Franklin Floating Rate Daily Access Fund's principal place of business is located at One Franklin Parkway, San Mateo, California 94403.

7.    Defendant Franklin Floating Rate Master Trust – Franklin Floating Rate Master Series is a mutual fund launched by Franklin Resources, Inc. and managed by Franklin Advisers, Inc. that is regulated by the Investment Company Act of 1940. Defendant Franklin Floating Rate

Master Trust – Franklin Floating Rate Master Series is a DIP Lender and is a New Priming DIP Lender (each as defined herein). As of March 8, 2018, Defendant Franklin Floating Rate Master Trust – Franklin Floating Rate Master Series held $13,853,531.27 of Roll-Up DIP Loans and, upon information and belief, held slightly less than $8,000,000 of NM DIP Loans. Through Franklin Advisers, Defendant Franklin Floating Rate Master Trust – Franklin Floating Rate Master Series' principal place of business is located at One Franklin Parkway, San Mateo, California 94403.

8.      Defendant Franklin Templeton Series II Funds - Franklin Floating Rate II Fund is a mutual fund launched by Franklin Resources, Inc. and managed by Franklin Advisers, Inc. that is regulated by the Investment Company Act of 1940. Defendant Franklin Templeton Series II Funds - Franklin Floating Rate II Fund is a DIP Lender and is a New Priming DIP Lender (each as defined herein). As of March 8, 2018, Defendant Franklin Templeton Series II Funds - Franklin Floating Rate II Fund held $4,034,482.57 of Roll-Up DIP Loans and, upon information and belief, held slightly less than $5,000,000 of NM DIP Loans. Through Franklin Advisers, Defendant Franklin Templeton Series II Funds - Franklin Floating Rate II Fund's principal place of business is located at One Franklin Parkway, San Mateo, California 94403.

9.      Defendant Kansas Public Employees Retirement System is the pension fund for certain employees of the state of Kansas and, with respect to its loans to Appvion, is managed by Franklin Advisers, Inc. Defendant Kansas Public Employees Retirement System is a DIP Lender and is a New Priming DIP Lender (each as defined herein). As of March 8, 2018, Defendant Kansas Public Employees Retirement System held $1,584,984.24 of Roll-Up DIP Loans and, upon information and belief, held slightly less than $3,000,000 of NM DIP Loans. Through

Franklin Advisers, Defendant Kansas Public Employees Retirement System's place of business for its loans to Appvion is located at One Franklin Parkway, San Mateo, California 94403.

10.    Defendant Franklin Floating Rate Master Trust – Franklin Lower Tier Floating Rate Fund is a mutual fund launched by Franklin Resources, Inc. and managed by Franklin Advisers, Inc. that is regulated by the Investment Company Act of 1940. Defendant Franklin Floating Rate Master Trust – Franklin Lower Tier Floating Rate Fund is a DIP Lender and is a New Priming DIP Lender (each as defined herein).  As of March 8, 2018, Defendant Franklin Floating Rate Master Trust – Franklin Lower Tier Floating Rate Fund held $13,882,250.31 of Roll-Up DIP Loans and, upon information and belief, held slightly less than $12,000,000 of NM DIP Loans. Through Franklin Advisers, Defendant Franklin Floating Rate Master Trust – Franklin Lower Tier Floating Rate Fund's principal place of business is located at One Franklin Parkway, San Mateo, California 94403.

11.    Defendant Franklin Floating Rate Master Trust – Franklin Middle Tier Floating Rate Fund is a mutual fund launched by Franklin Resources, Inc. and managed by Franklin Advisers, Inc. that is regulated by the Investment Company Act of 1940. Defendant Franklin Floating Rate Master Trust – Franklin Middle Tier Floating Rate Fund is a DIP Lender and is a New Priming DIP Lender (each as defined herein). As of March 8, 2018, Defendant Franklin Floating Rate Master Trust – Franklin Middle Tier Floating Rate Fund held, upon information and belief, slightly less than $12,000,000 of NM DIP Loans. Through Franklin Advisers, Defendant Franklin Floating Rate Master Trust – Franklin Middle Tier Floating Rate Fund's principal place of business is located at One Franklin Parkway, San Mateo, California 94403.

12.    Defendant Franklin Templeton Series II Funds – Franklin Upper Tier Floating Rate Fund is a mutual fund launched by Franklin Resources, Inc. and managed by Franklin

Advisers, Inc. that is regulated by the Investment Company Act of 1940. Franklin Templeton Series II Funds – Franklin Upper Tier Floating Rate Fund is a DIP Lender. As of March 8, 2018, Defendant Franklin Templeton Series II Funds – Franklin Upper Tier Floating Rate Fund held $20,210,263.15 of Roll-Up DIP Loans. Through Franklin Advisers, Defendant Franklin Floating Rate Master Trust – Franklin Middle Tier Floating Rate Fund's principal place of business is located at One Franklin Parkway, San Mateo, California 94403.

## JURISDICTION AND VENUE

13.    This Court has personal jurisdiction over the Defendants pursuant to Section 5-1402 of the New York General Obligations Law as the Defendants consented to the jurisdiction of any state or federal court located in the State of New York sitting in the County of New York. In accordance with Section 5-1401 of the New York General Obligations Law, the parties have also agreed that New York law governs this action.

14.    Section 5-1402 of the New York General Obligations Law is properly invoked here because the dispute between the parties relates to an obligation arising out of a transaction covering in the aggregate not less than one million dollars.

15.    This Court also has personal jurisdiction over each of the Defendants because each has consented, pursuant to the express provisions within the DIP Credit Agreement and other DIP Loan Documents, to the jurisdiction of the state court situated in New York County, State of New York.

16.    Venue is proper in this Court pursuant to N.Y. C.P.L.R. § 501 by reason of the written agreement (the DIP Credit Agreement (as defined herein)) of the parties consenting to the personal jurisdiction of this Court and fixing the venue of this action in this Court.

## GENERAL ALLEGATIONS

**A.    The Prepetition Credit Agreement Transactions with Appvion**

17.    Pursuant to that certain Credit Agreement, dated as of June 28, 2013 (as amended and in effect, the ***"Prepetition Credit Agreement"***) by and among Appvion, as borrower, certain guarantors, affiliated with Appvion, as guarantors, the lenders party thereto, Jefferies Finance LLC, as administrative agent (in such capacity, the ***"Prepetition Administrative Agent"***), Fifth Third Bank (***"Fifth Third"***), as revolver agent (the ***"Prepetition Revolver Agent"***), and KeyBank, as documentation agent (in such capacity, the ***"Prepetition Documentation Agent"*** and together with the Prepetition Administrative Agent and the Prepetition First Lien Revolver Agent, the ***"Prepetition First Lien Agents"***), Appvion borrowed term loans, revolving loans and letters of credit from various lenders, including the Plaintiff and the Franklin Lender Defendants.

18.    As of October 1, 2017, $253.3 million was outstanding under the Prepetition Credit Agreement, including (a) $178.3 million of term loans and (b) $75 million of revolving loans, which revolving loans included a letter of credit sub-facility in the amount of $13.1 million.

**B.    Appvion and Related Entities File for Bankruptcy and
Franklin Proposes to Provide Debtor-in-Possession Financing**

19.    On October 1, 2017 (the ***"Petition Date"***), Appvion and certain of its affiliates (collectively, the ***"Debtors"***) filed petitions commencing chapter 11 cases (the ***"Bankruptcy Cases"***) in the United States Bankruptcy Court for the District of Delaware (the ***"Bankruptcy Court"***). Unlike the Franklin Defendants, neither KeyBank nor Fifth Third had advance notice of the Debtors' bankruptcy filing.

20.    On October 2, 2017, the Debtors filed a motion seeking to obtain debtor-in-possession financing under the proposed Superpriority Senior Debtor-in-Possession Credit

Agreement, dated as of October 2, 2017 (as amended, the *"DIP Credit Agreement"*),[2] among, *inter alia*, Appvion, as borrower, its affiliated guarantors, as guarantors, Wilmington Trust, National Association, as administrative agent (the *"DIP Agent"*), and various lenders subject thereto (the *"DIP Lenders"*) that provided for (a) $85 million of new money loans (the *"NM DIP Loans"*) and (b) the roll-up of all obligations (other than the outstanding letters of credit) under the Prepetition Credit Agreement, which were then to be treated as DIP loans (the *"Roll-Up DIP Loans,"* and along with the NM DIP Loans, the *"DIP Loans"*).

21.    On October 3, 2017, the Bankruptcy Court held an emergency hearing to determine whether to approve the original form of the DIP Credit Agreement on an interim basis. On October 3, 2017, the Bankruptcy Court entered an interim order approving the original form of the DIP Credit Agreement on an interim basis pending a final hearing that was scheduled for October 30, 2017.

## C.    Negotiation by KeyBank, Fifth Third and Revisions to DIP Loan Documents

22.    By and large, the original DIP Credit Agreement substantially tracked the provisions of the Prepetition Credit Agreement and proposed to exchange the loans and obligations arising under the Prepetition Credit Agreement into loans under the DIP Credit Agreement (which exchange is commonly referred to as a *"roll-up"* in bankruptcy cases). Under the DIP Credit Agreement, the liens securing the Roll-Up Loans are *pari passu* with the liens securing the NM DIP Loans, (*see* DIP Credit Agreement, at § 2.17(d)-(e)) (the *"Pari Passu Lien Sections"*), which entitles the Roll-Up Loans to *pari passu* payment priority unless the Roll-Up Lenders agree to differing treatment. The Franklin Defendants sought to alter the priority of payments under the DIP Credit Agreement, as compared to the Prepetition Credit Agreement, in

---

[2] A true and correct copy of the Final DIP Financing Order (as defined herein), which attaches the form of the DIP Credit Agreement as Exhibit A thereto, is annexed hereto as Exhibit A.

certain limited instances, by providing a narrow payment priority for the NM DIP Loans over the Roll-Up DIP Loans in two discrete situations (the ***"Limited Seniority Exceptions"***): (a) upon a liquidation of collateral or receipt of payments by the DIP Agent after an enforcement of remedies (which includes an acceleration) (the waterfall provided by such section, ***"Collateral Liquidation Waterfall"***) (*see* DIP Credit Agreement, at § 8.02(a)), and (b) from the proceeds of certain prepayments authorized under the DIP Credit Agreement, which, in the context of a refinancing would only apply if there are Net Cash Proceeds (as defined in the DIP Credit Agreement). *See Id.*, at §§ 1.01 (definition of Net Cash Proceeds) & 2.05(b)(iii). Neither of these limited exceptions have any applicability to the instant disputes.

23.     Because of the potential impact upon KeyBank and Fifth Third, the largest other revolving bank under the Prepetition Credit Agreement, both KeyBank and Fifth Third approached Franklin and the Debtors to effect certain modifications to the proposed DIP Loan Documents to enable such credit facility to be acceptable to them. These negotiations took place between October 3, 2017 and October 30, 2017. As a result of these negotiations, KeyBank, Fifth Third, the Debtors and Franklin agreed to certain modifications to both the DIP Credit Agreement and the form of order approving the DIP Credit Agreement (as revised) (such agreed form of order, ***"Final DIP Financing Order,"*** and along with the DIP Credit Agreement as revised and approved by such order, the ***"DIP Loan Documents"***). Among the other terms negotiated and agreed upon by such KeyBank, Fifth Third, the Debtors and Franklin, among others, were the following:

    (a)    that any future priming liens or material modifications would require the consent of the Prepetition Revolver Agent (Fifth Third) and the Prepetition Documentation Agent (KeyBank) (*see, e.g.*, Final DIP Financing Order, at ¶¶ 45(b)(ii)); and

    (b)    that the Collateral Liquidation Waterfall that benefited the NM DIP Loans would not apply for any exit financing (but only applied during the

bankruptcy cases), and such carveout to the Collateral Liquidation Waterfall could not be modified without the consent of each Roll-Up DIP Lender. *See, e.g.*, DIP Credit Agreement §§ 8.02(b) & 11.01(i) (the *"Exit Financing Carveout"*).

In fact, at the October 30, 2017 final hearing, all creditor constituencies appearing at such hearing agreed upon a form of the Final DIP Financing Order.

**D.    Entry of Consensual Final DIP Facility Order and Applicable Terms of Amended DIP Credit Agreement**

24.    On October 31, 2017, the Bankruptcy Court entered the Final DIP Financing Order in the form agreed upon by KeyBank, Fifth Third, Franklin, the official committee of unsecured creditors, an ad hoc committee of subordinated noteholders and the Debtors.

25.    Based upon the terms and provisions of the Final DIP Financing Order and the approved DIP Credit Agreement, KeyBank, Fifth Third, and others obtained numerous rights and protections, which are described below:

**(i)    Roll-Up of Loans into DIP Loans**

26.    Pursuant to the DIP Loan Documents, all loans (other than letter of credit obligations) under the Prepetition Credit Agreement were rolled up under the DIP Credit Agreement and converted into Roll-Up DIP Loans. *See, e.g.*, Final DIP Financing Order, at ¶ 5(a); DIP Credit Agreement, at § 2.01(c)(ii).

**(ii)    *Pari Passu* Treatment of Roll-Up Loans and NM DIP Loans**

27.    Pursuant to the *Pari Passu* Lien Sections, the Roll-Up Loans and NM DIP Loans are secured by liens of equal priority. *See* DIP Credit Agreement, at § 2.17(d)-(e)). By virtue of the *pari passu* lien treatment, the Roll-Up Loans and NM DIP Loans are also entitled to *pari passu* payment priority unless the Roll-Up Lenders agree to differing treatment. The Roll-Up Lenders only agreed to subordinated payment priority in the Limited Seniority Exceptions.

### (iii)    Seniority of Liens Held for Benefit of All DIP Lenders, including the Roll-Up DIP Lenders

28.    Under the express terms of the DIP Loan Documents, the DIP Loans (including the Roll-Up DIP Loans) were granted senior status and the *"DIP Liens [securing the DIP Loans] shall not be made subject to or* **pari passu** *with any lien or security interest heretofore or hereafter granted in the [Bankruptcy] Cases or any [successor bankruptcy case]." See, e.g.*, Final DIP Financing Order, at ¶ 13(b); *see also Id.*, at ¶ 49(a) (*"Except as expressly provided herein or in the DIP Facility Documents, no claim or lien having a priority senior to or* **pari passu** *with that granted by this Final Order to the DIP Secured Parties shall be granted while any portion of the DIP Obligations remains outstanding . . . ."*); DIP Credit Agreement, § 7.25. In other words, as DIP Loans, all of KeyBank's Roll-Up DIP Loans had first priority, senior secured status.

29.    In fact, the Final DIP Financing Order provides that no modification of the Final DIP Financing Order would affect the liens or priority accorded to the DIP Loans:

> Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of the Court, or any other court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment or vacatur shall not affect the validity and enforceability of the DIP Obligations, or any lien, claim or priority authorized or created hereby.

*See* Final DIP Financing Order, at ¶¶ 29(a) (the *"Priming Lien Prohibition"*).

### (iv)    Priming Liens Not Permitted Without KeyBank's Consent

30.    Among the major concessions granted to KeyBank and Fifth Third as part of their negotiations that led to the consensual Final DIP Financing Order – to induce KeyBank and Fifth Third to consent to the dilution of collateral and the Limited Seniority Exceptions (described

above) – each of KeyBank's and Fifth Third's consent was required for any *pari passu* or priming

lien on the Collateral (as defined in the DIP Credit Agreement, the ***"DIP Collateral"***). *See* Final

DIP Financing Order, at ¶ 45(b)(ii) (the ***"Priming Lien Consent Rights"***).

### (v)    Material Modifications of DIP Loan Documents Not Permitted Without KeyBank's Consent

31.    Further, each of KeyBank and Fifth Third negotiated for the inclusion in the Final

DIP Financing Order for the prohibition upon ***"any material amendment, modification or***

***extension of this [DIP Financing] Order"*** without each of their consent. *Id.* at ¶ 45 (last

sentence) (the ***"Material Modification Consent Requirement"***).

### (vi)    Sharing Provision Controls Any Disproportionate Payments Received by Any Lenders

32.    Unless one of the two Limited Seniority Exceptions apply, the DIP Credit

Agreement also requires that any disproportionate payment received by any lender be shared *pro*

*rata* with all of the other DIP Lenders. *See, e.g.*, DIP Credit Agreement §2.13 (the ***"Pro Rata***

***Sharing Requirement"***).

### (vii)    Prohibition against Any Reduction of Principal or Any Payments Required under the DIP Loan Documents

33.    The DIP Credit Agreement also prohibits any waiver, modification or amendment

that would ***"reduce the principal of . . . any [DIP] Loan"*** or ***"reduce . . . any other amounts***

***payable [under the DIP Credit Agreement] or under any other Loan Document without the***

***written consent of each Lender entitled to such amount."*** *See, e.g.*, DIP Credit Agreement

§11.01(d) (the ***"Principal and Payment Reduction Bar"***).

### (viii)    Prohibition upon Any Series of Related Transactions that Would Release All or Substantially All of the DIP Collateral

34.    The DIP Credit Agreement also prohibits the "release [of] all or substantially all of

the Collateral in any transaction or series of related transactions, without the written consent of

each [DIP] Lender." *See, e.g.*, DIP Credit Agreement § 11.01(g) (the "**Collateral Release Prohibition**").

### (ix)    Parties Expressly Agree upon Jurisdiction and Venue of New York Courts for Inter-Lender Disputes; New York Law Governs

35.    The DIP Lenders expressly agreed that any inter-lender disputes under the DIP Credit Agreement would be adjudicated before the courts located in Manhattan, New York.

> EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY [ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT] OR PROCEEDING [FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT] SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT [COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY] OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT [THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK].

*See* DIP Credit Agreement, at § 11.14(b).

36.    Further, the parties to the DIP Credit Agreement agreed that the DIP Credit Agreement shall be governed by New York law. *See* DIP Credit Agreement, at § 11.14(a).

37.    Cumulatively, the above-referenced provisions provided a strong set of protections for the benefit of KeyBank and Fifth Third to help ensure that their rights would not be negatively affected by actions of the Required Lenders. In fact, in light of the fact that the Franklin Defendants themselves constituted the "Required Lenders" under the DIP Credit Agreement, KeyBank and Fifth Third viewed these rights and protections as indispensable.

**E.    Franklin's Initial Efforts to Unilaterally Impose Discriminatory Treatment upon KeyBank and Fifth Third, Among Others, through Stalking Horse Sales Process**

38.    Little did KeyBank or Fifth Third know how soon their negotiated protections would be needed.

39.     Based upon the Debtors' filings in the Bankruptcy Cases, on or about January 10, 2018, Franklin and the Debtors began to negotiate for Franklin to utilize a credit bid under the DIP Credit Agreement for the purchase of substantially all of the Debtors' operating assets.

40.     These efforts led to the finalization of a stalking horse purchase agreement between the Debtors and Franklin on or about February 8, 2018 (the "***Stalking Horse Purchase Agreement***"). Although the Stalking Horse Purchase Agreement was nominally between "a special purpose entity to be formed by the DIP Lenders," as purchaser, and the Debtors, as sellers, there were no negotiations between the Debtors and such "purchaser." Rather, all of the negotiations relating to the Stalking Horse Purchase Agreement were between the Debtors and Franklin. In fact, the stalking horse purchaser (Appvion Holding Corp.) (the "***Stalking Horse Purchaser***") was not even formed until March 5, 2018. *See* Exhibit D, at Exh. A.

41.     Upon negotiating and finalizing the Stalking Horse Purchase Agreement, on February 8, 2018 the Debtors filed a motion (the "***Sale Motion***") with the Bankruptcy Court to sell substantially all of their assets. Pursuant to the Sale Motion, the Debtors (a) proposed to sell their assets pursuant to the Stalking Horse Purchase Agreement unless a higher and/or better offer was received, (b) announced an agreement with Franklin for an increase in the amount of the NM DIP Loans under the DIP Credit Agreement by an additional $15 million, (c) announced that a new entity would be formed to purchase the Debtors' assets (the "***DIP Purchaser***"), (d) provided that as part of the proposed consideration provided under the Stalking Horse Purchase Agreement that different portions of the DIP Loans would be treated differently, with (i) the portion of the DIP Loans constituting the NM DIP Loans being assumed by the DIP Purchaser and (ii) the remaining DIP Loans, comprised of the Roll-Up DIP Loans, being fully credit bid and receive the equity of the DIP Purchaser.

42.    Thus, the Defendants attempted to provide themselves with assumed loans while Plaintiff (and Fifth Third) would be left with equity in the Appvion-successor (the DIP Purchaser).

43.    In late February 2018, both KeyBank and Fifth Third filed objections to the proposed disparate treatment for the NM DIP Loans and the Roll-Up DIP Loans, citing that the disparate treatment of the NM DIP Loans as compared to the remainder of the DIP Loans, violated numerous terms of the DIP Loan Documents. KeyBank and Fifth Third both argued that because Franklin was valuing the Debtors' assets as being worth 100% of the amount of the DIP Loans, there was no basis for disparate treatment.

**F.    Franklin Admits That It Violated DIP Loan Documents and Devised New Machination to Effect Discriminatory Treatment upon Revolving Lenders – the New Priming DIP Facility**

44.    In direct response to the sale objections raised by KeyBank and Fifth Third, Franklin basically admitted that it had run afoul of the protections provided to KeyBank and Fifth Third by withdrawing its attempt to offer bifurcated treatment of the DIP Loans under the proposed Stalking Horse Purchase Agreement.

45.    Instead of providing for disparate treatment to different DIP Loans just through the sale arrangements, Franklin proposed a two-step process of (a) rolling-up the NM DIP Loans that it had been seeking to give favored treatment to into a new priming debtor-in-possession loan facility and (b) then equitizing all of the remaining DIP Loans under the existing DIP Credit Agreement. This new machination for foisting disparate treatment upon KeyBank and Fifth Third was set forth in a series of filings which included (a) a March 5, 2018 motion to approve such new priming, senior debtor in possession financing facility (*see* Bankruptcy Cases, Docket

No. 520)[3] (the "**New Priming DIP Motion**");[4] (b) concurrently modified the Stalking Horse Purchase Agreement to make conforming changes (*see* Docket No. 530 (dated March 5, 2018) (the "**Revised Stalking Horse Purchase Agreement**")[5] and (c) concurrently sought authorization to modify the DIP Credit Agreement (through a waiver and amendment to the DIP Credit Agreement) and modifications to the Final DIP Financing Order. *See* New Priming DIP Motion, at Exh. B (the "**Waiver, Consent and Fourth Amendment to DIP Credit Agreement**") and Exh. D (proposed Interim order).

46.    Specifically, under the New Priming DIP Motion, Franklin offered to provide a new priming debtor-in-possession loan facility (the "**New Priming DIP Facility**" and the loans thereunder, the "**New Priming DIP Loans**")) in the amount of $100 million, with (a) $15 million of new financing (the "**New Priming NM DIP Loans**") and (b) $85 million to effect a roll-up "refinancing" of the existing NM DIP Loans. *See* Docket No. 527 at ¶ 5. Under the New Priming DIP Facility and the related amendment to the DIP Credit Agreement, the priming loans would be senior to the existing DIP Loans. Further, such documents require that (a) the bankruptcy sale of the Debtors' assets must occur on or before May 30, 2018 (*see* Exhibit B, at Exh. B (Waiver, Consent and Fourth Amendment to DIP Credit Agreement), at §3.6(C)), (b) that the DIP Purchaser shall assume the $100 million of obligations under the New Priming DIP Facility as an exit facility (*see* Exhibit B, at Exh. A (New Priming DIP Facility Term Sheet), at 11), and (c) all Roll-Up DIP Loans would be credit bid and receive a *pro rata* allocation of the equity in the new DIP Purchaser. *See* Docket No. 527, at ¶ 26. In other words, though the method may be different,

---

[3] Docket No. references herein refer to the docket maintained for the Bankruptcy Cases in the Bankruptcy Court.

[4] A true and correct copy of the New DIP Priming Motion is annexed hereto as Exhibit B.

[5] A true and correct copy of the Revised Stalking Horse Purchase Agreement is annexed hereto as Exhibit C.

the outcome is exactly the same: Franklin proposed to effect the same assumption of the NM DIP Loans and equitization of the Roll-Up DIP Loans through the issuance of the New Priming DIP Facility and the subsequent sale.

**G.     The Bankruptcy Court Approved New Priming DIP Facility, But Specifically Preserved KeyBank and Fifth Third's Inter-Lender Claims Against, *Inter Alia*, Franklin**

47.     At the interim hearing held on March 12, 2018, although the Debtors failed to provide any of the requisite evidentiary support for a priming lien under Bankruptcy Code Section 364(d), the Bankruptcy Court approved the New Priming DIP Facility on the basis that the Debtors may be forced to liquidate unless the Bankruptcy Court approved such financing.

48.     The Bankruptcy Court, however, specifically held on the record that the Bankruptcy Court's rulings would not, and did not, affect any inter-lender rights that either KeyBank or Fifth Third may possess against other DIP Lenders and other parties to the DIP Credit Agreement and that KeyBank or Fifth Third could pursue any claims that they may hold in any appropriate forum. Such holding was specifically incorporated into the interim order entered by the Bankruptcy Court on March 12, 2018. [Docket No. 564, at ¶¶ 2 & 16, Rider B.]

49.     Over two weeks after the March 12, 2018 hearing, on March 27, 2018 the Debtors filed with the Bankruptcy Court the Senior Superpriority Senior Debtor-In-Possession Credit Agreement, dated as of March 16, 2018 (the "***New Priming DIP Credit Agreement***"), among, *inter alia*, Appvion, as borrower, Appvion's affiliated guarantors party thereto, Wilmington Trust, National Association, as administrative agent, each of the Franklin NM DIP Lenders, as the lenders thereunder. *See* New Priming DIP Credit Agreement [Docket No. 618 (filed March 27, 2018)]], which sets forth the terms of the New Priming DIP Facility.

50.     Additionally, each of the Defendants executed the Waiver, Consent and Fourth Amendment to DIP Credit Agreement shortly after the March 12, 2018 hearing, which

agreement (a) waived numerous rights provided for under the original DIP Credit Agreement to permit such original DIP Facility to be primed by and subordinated to the New Priming DIP Facility. *See* Exhibit B (Waiver, Consent and Fourth Amendment to DIP Credit Agreement). The Defendants' execution of such Waiver, Consent and Fourth Amendment to the DIP Credit Agreement has materially harmed KeyBank and has violated KeyBank's contractually protected rights under the DIP Credit Agreement and the other DIP Loan Documents.

51.    On April 4, 2018, the Bankruptcy Court entered an order approving the New Priming DIP Facility (the ***"Amended Final DIP Financing Order"***).  The Amended Final DIP Financing Order specifically provided that it was "without prejudice" to the inter-lender claims of KeyBank and Fifth Third against Franklin.  [Docket No. 639, at ¶ 14].

52.    Based upon the Bankruptcy Court's express reservation and preservation of inter-DIP Lender claims and causes of action as set forth in, *inter-alia*, the Amended Final DIP Financing Order (and the Plan (as defined below)), KeyBank is bringing this suit against the Franklin Defendants to remedy Franklin's numerous breaches of the DIP Loan Documents.

**H.    Pursuant to the New Priming DIP Facility, Franklin
Breaches Many Terms of the DIP Loan Documents**

53.    In proposing and implementing the New Priming DIP Facility, Franklin violated numerous provisions of the DIP Loan Documents, including the (i) Lien Prohibitions and Priming Lien Consent Rights, (ii) Material Modification Consent Requirement; (iii) *Pro Rata* Sharing Requirement; (iv) Principal and Payment Reduction Bar; and (v) Collateral Release Prohibition.

54.    Although a review of the summary terms indicated that numerous rights and protections provided to, *inter alia*, KeyBank and Fifth Third under the DIP Loan Documents are being decimated, a review of the actual New Priming DIP Credit Agreement confirms the scope

of the breaches caused by Franklin actions in pursuing the entry and approval of the New Priming DIP Facility.

55.    Here, Franklin apparently decided that it could best effect indirectly – through bifurcating the disparate treatment under the guise of two motions (the New Priming DIP Motion and the Sale Motion) – what it had difficulty doing directly: the discriminatory treatment of KeyBank, Fifth Third, and other similarly situated DIP Lenders. A review of the terms of the New Priming DIP Credit Agreement and the New Priming DIP Motion demonstrates that KeyBank and Fifth Third are being treated in gross violation of the terms of the DIP Loan Documents, which are reviewed below:

> (i)    **Breaches of Priming Lien Prohibitions and Priming Lien Consent Rights**

56.    Under the New Priming DIP Facility, Franklin is requiring that both its New Priming NM DIP Loans and the roll-up of $85 million of NM DIP Loans are to prime and be senior to the remaining DIP Loans. *See* Exhibit E (New Priming DIP Credit Agreement), at §2.17(c).

57.    Also, at no time did Franklin or any other party seek or obtain KeyBank's consent to the priming provisions of the New Priming DIP Facility. In fact, KeyBank specifically informed the Debtors and Franklin that it would not consent to being primed by $100 million of financing under the New Priming DIP Facility when there is only $15 million of new money loans being provided to the Debtors.

58.    Franklin proposed and implemented the New Priming DIP Facility that includes priming provisions; in doing so, Franklin violated the Priming Lien Prohibition and the Priming Lien Consent Rights provisions of the DIP Loan Documents.

### (x) Breach of Material Modification Consent Requirement

59.     Again, under the New Priming DIP Facility, Franklin is requiring that $100 million under the New DIP Priming Facility prime all remaining DIP Loans. *See* Exhibit E (New Priming DIP Credit Agreement), at §2.17(c). Such subordination of rights is material and requires KeyBank's consent.

60.     Also, at no time did Franklin or any other party seek or obtain KeyBank's consent to the priming provisions of the New Priming DIP Facility. The failure to obtain KeyBank's consent is a breach of the Material Modification Consent Requirement.

### (xi) Breach of *Pro Rata* Sharing Requirement

61.     Further, unless authorized by another provision of the DIP Loan Documents, any disproportionate recovery of DIP Loans by some DIP Lenders is required to be shared *pro rata* among all DIP Lenders pursuant to the *Pro Rata* Sharing Requirement of Section 2.13 of the DIP Credit Agreement.

62.     Under the New Priming DIP Facility, Franklin also proposed that its NM DIP Loans are to be repaid in full—either through the assumption of the NM DIP Loans (or the issuance of notes payable to the NM DIP Lenders) by the Stalking Horse Purchaser (if it is the winning bidder) or, otherwise, through a cash payment.

63.     Franklin did not share any repayment of the NM DIP Loans among all the holders of the other DIP Loans; instead of sharing payments, Franklin is proposing that all remaining DIP Loans (i.e., the Roll-Up DIP Loans) be equitized, i.e., converted to equity in the company. *See* Exhibit E (New Priming DIP Credit Agreement), at § 5.16. Such distribution scheme proposed by Franklin is in breach of the *Pro Rata* Sharing Requirement in the DIP Loan Documents.

(xii)    **Breach of Principal and Payment Reduction Bar**

64.    The failure to give effect to the *Pro Rata* Sharing Requirement of Section 2.13 of

the DIP Credit Agreement also leads to a violation of the of Principal and Payment Reduction

Bar.

65.    Here, the roll-up of the NM DIP Loans into the New Priming DIP Facility triggers

the obligation of the Franklin NM DIP Lenders to share any such disproportionate payments with

the other DIP Lenders. However, in violation of the Principal and Payment Reduction Bar, the

terms of the New Priming DIP Facility provides that such payments be made solely on account

of the NM DIP Loans. *See* Exhibit E (New Priming DIP Credit Agreement), at § 5.16.

66.    As such, Franklin has violated the Principal and Payment Reduction Bar.

(xiii)    **Breach of Collateral Release Prohibition**

67.    The New Priming DIP Facility, the Sale Motion and the Fourth Amendment to the

DIP Credit Agreement are a "series of related transactions":

(a)    ***The New Priming DIP Facility***: (i) specifically requires that the Fourth
Amendment to the DIP Credit Agreement be approved by the Bankruptcy
Court as a precondition to funding under such New Priming DIP Facility;
*see* Exhibit B  (New Priming DIP Motion), at Exh. A (Senior DIP Facility
Term Sheet), at 5; (ii) likewise requires that the bidding procedures for the
Sale Motion be approved by the Bankruptcy Court as a precondition to
funding under such New Priming DIP Facility; *Id*.; and (iii) provides that
the New Priming DIP Facility shall be converted into an "Exit Facility"[6] if
the Stalking Horse Purchaser becomes the winning bidder. *Id*., at 11.

(c)    ***The Fourth Amendment to the DIP Credit Agreement***: (i) specifically
incorporates sale process milestones related to the Sale Motion; *see*
Exhibit B (New Priming DIP Motion), at Exh. B (Waiver, Consent and
Fourth Amendment to DIP Credit Agreement), at § 3.6(C); (ii) authorizes
the subordination of the DIP Loans to the New Priming DIP Facility, *Id*.,
at § 3.5; (iii) specifically requires that the approval of the New Priming
DIP Facility and that such facility be in effect as conditions to the
effective date for the Waiver, Consent and Fourth Amendment to DIP

---

[6] Each, an "***Exit Facility***."

Credit Agreement. *Id.*, at § 4(A)(iv)-(v); and (iv) likewise requires that the bidding procedures for the Sale Motion be approved by the Bankruptcy Court as a condition to the effective date for the Waiver, Consent and Fourth Amendment to DIP Credit Agreement. *Id.*, at § 4(A)(v).

Such provisions demonstrate that the sale process, the New Priming DIP Facility and the Fourth Amendment to the DIP Credit Agreement form a "series of related transactions."

68.     Under the specific terms of the Final DIP Financing Order, Franklin and all parties to the DIP Credit Agreement agreed that if any series of related transactions would cause the release of all of the DIP Collateral under the DIP Credit Agreement, that any required waivers, amendments or consents need to be approved by "each Lender."

69.     The Debtors and Franklin, however, have proposed a series of related transactions that will cause all DIP Collateral to be released even though the DIP Loans are not being repaid in full. Specifically, upon the Stalking Horse Bidder becoming the winning bidder, all DIP Collateral is being released even though the DIP Loans held by KeyBank and Fifth Third are being equitized (and not repaid in full). *See* Docket No. 527, at ¶ 26. Accordingly, this is also in breach of the DIP Loan Documents.

### (iv)    Franklin Elected to Breach Terms of DIP Loan Documents

70.     Franklin's avoidance of the strong protections that Franklin had previously contractually agreed to provide to KeyBank has caused material damage to KeyBank. By avoiding the contractual protections to which Franklin had previously agreed, KeyBank is now unlikely to recover any money on its DIP Loans as KeyBank has been improperly subordinated to $100 million of debt and may soon be forced to hold an illiquid, minority equity sliver. Indeed, instead of holding senior DIP Loans secured by assets, KeyBank is now being forced to hold an illiquid, minority equity position.

I.    **Franklin Breached the Implied Covenant of Good Faith and Fair Dealing When It Demanded that KeyBank Release Claims Against Franklin—that Were Expressly Preserved in the Amended Final DIP Financing Order and the Plan—in Exchange for Rights Already Guaranteed to KeyBank Under the DIP Credit Agreement and Delaware General Corporate Law**

71.    As a result of the Bankruptcy Court's approval of the New Priming DIP Facility, Defendants began to finalize documentation consistent with Franklin's assumption of NM DIP Loans and the equitization of the Roll-Up DIP Loans through the issuance of the New Priming DIP Facility and the subsequent sale to the DIP Purchaser (the "***DIP Sale***").

72.    To assure, among other things, minority equity holder protections, KeyBank attempted to negotiate with Franklin various modifications to the equity documentation consistent with KeyBank's *pro rata* distribution rights.

73.    Specifically, KeyBank and Fifth Third made a number of modifications to the Appvion Holding Corp. Governance Term Sheet ("***Term Sheet***"), which described the proposed material governance terms of the DIP Purchaser in connection with the DIP Sale.  These modifications were memorialized in a version of the Term Sheet dated May 3, 2018 ("***Term Sheet Comments***"), which reflected consolidated comments from KeyBank and Fifth Third, among others, for the revolver banks ("***Revolver Banks***").

74.    The Term Sheet Comments provided a number of comments and edits to the amended and restated Certificate of Incorporation, the Amended and Restated Bylaws, the Stockholder Agreement, and other governance matters affecting KeyBank's minority equity interests.

75.    In the section on "Amended and Restated Certificate of Incorporation," the Term Sheet Comments included the following proposed changes (the Revolver Bank comments below are designated either as a "COMMENT", or deletions as indicated by a strike through, or proposed insertions as indicated by a double underlining):

**Capital Stock**

COMMENT:  The Revolver Banks oppose any current or future provisions authorizing the Board to issue blank check preferred stock that would potentially have dilutive or other adverse effects on the Revolver Banks' rights.  Reasonable and customary anti-dilution terms should be included in any authorization for any future equity authorizations.

**Director Nomination Rights**

Yes for one of the first lien creditors of Appvion, Inc. ("First Lien Creditor #1") and USW, USW and any stockholder holding 5% or more of the outstanding common stock, based on the standards described below under "Stockholders Agreement - Board Composition."

COMMENT: Confirm identity of First Lien Creditor #1. Please confirm that such entity is to hold 60% of the common stock at closing (based upon such *pro rata* proportion of the Loans held under the Original DIP Loan Agreement).

**Indemnification and Limitation on Director and Officer Liability**

Notwithstanding the foregoing, nothing herein shall affect or limit in any way the claims and causes of action asserted or that may be asserted in the Supreme Court of New York for the County of New York in a civil action captioned (a) *KeyBank National Association vs. Franklin Advisors Inc., et al.,* Index No. 651517/2018 and (b) *Fifth Third Bank vs. Franklin Advisors, Inc., et al.,* Index No. 651518/2018, along with any successor or related actions and or as such litigations may be transferred or removed (as and if applicable) under applicable law, along with any related claims and rights (collectively, the "*Excepted Matters*"). Further, indemnifications and limitations of liability shall not apply to any Excepted Matter.

76.    In the section on "Amended and Restated Bylaws," the Term Sheet Comments included the following proposed changes:

**Board of Directors**

Removal of directors ("with cause" or "without cause") by at least 66-2/3% of the total voting power of the issued and outstanding stock entitled to vote; *provided*, *however*, that directors appointed pursuant to the director appointment rights may be removed (a) by

the appointing stockholder at any time and for any reason and (b) only "with cause" in all other instances and appointing stockholder retains right to appoint replacement; *further provided* that notwithstanding the foregoing, independent directors may be removed only "with cause".

**Transfer Restrictions**

Notwithstanding the foregoing, nothing herein shall constrain any stockholder from complying with any legal or regulatory matters (including any disposal of shares required for compliance with legal or regulatory requirements).

COMMENT: Generally, and subject to review of the transfer prohibition language, as regulated institutions, the Revolver Banks should not be subject to transfer restrictions which constrain their ability to dispose of shares as may be necessary to comply with holding period restrictions and other legal and regulatory requirements.

77.    In the section on "Stockholders Agreement," the Term Sheet Comments included the following proposed changes:

**Board Composition**

Initial Board: Upon the consummation of the acquisition, the board will initially consist of seven (7) directors, as follows:

- The Company's CEO;

- ~~Four~~Two (~~4~~2) directors appointed by First Lien Creditor #1 and its affiliates, ~~two~~one (1) of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act;

- One (1) director appointed by the United Steelworkers ("USW"), who must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act;

- One (1) director appointed by majority vote of the stockholders other than First Lien Creditor #1 and its affiliates, who must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act; and

- ~~One (1) director [TBD].~~Two (2) directors to be elected by the stockholders [subject to review of *pro forma* cap table].

Ongoing Board: As elected by the stockholders; *provided*, *however*, that:

- the Company's then-CEO at any time will serve as a director;

- First Lien Creditor #1 will have the right to appoint ~~(a)four(4~~ two (2) directors, ~~twoone(21)~~ of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as First Lien Creditor #1 owns less than 50% of the issued and outstanding common stock that First Lien Creditor #1 held as of the consummation of the acquisition, ~~(b) three (3) directors, two (2) of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act,~~ at which time First Lien Creditor #1 will have the right to appoint one (1) director until such time as First Lien Creditor #1 ~~owns~~ holds less than 25% of the issued and outstanding common stock that First Lien Creditor #1 held as of the consummation of the acquisition, ~~and (c) two (2) directors, each of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as First Lien Creditor #1 owns less than 10% of the issued and outstanding common stock that First Lien Creditor #1 held as of the consummation of the acquisition; and;~~

- USW will have the right to appoint one (1) director, who must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as the third anniversary of the consummation of the acquisition; and

- One (1) director appointed by majority vote of the stockholders other than First Lien Creditor #1 and its affiliates, who must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act.

**Information Rights/Financial Reporting Requirements**

COMMENT: The above restrictions and blackout period are not acceptable to the Revolver Banks. There should be no restrictions on the Revolver Banks' receipt of reporting information other than customary confidentiality restrictions which must allow for disclosure as required to comply with regulatory requirements. The Revolver Banks should have the right to inspect all books and

records and meet with management and the right to receive non-attorney-client privileged materials that are provided to the Board.

78.    In the section on "Other Governance Matters," the Term Sheet Comments included the following proposed changes:

**Registration Rights Agreement**

COMMENT: This provision should be clarified to grant registration rights to any stockholder who holds 10% or more of the outstanding common stock at the consummation of the acquisition but subsequently owns less than 10%.

79.    On May 14, 2018, the DIP Purchaser's bid was declared the winner.

80.    On May 21, 2018, the DIP Purchaser, under the control of Franklin, posted on the DIP Agent's file share portal, "definitive documents" related to the DIP Sale (the "***Definitive Documents***"). The Definitive Documents, which included the Certificate of Incorporation, Bylaws, Stockholders Agreement, Registration Rights Agreement, and Equity Incentive Plan, failed to incorporate KeyBank and Fifth Third's substantive comments and revisions memorialized in the Term Sheet Comments. As a result, the Definitive Documents conferred special treatment to the majority that would not result naturally from the exercise of their *pro rata* voting rights.

81.    One of the most egregious provisions in the Definitive Documents resided in the Stockholder Agreement by and among the DIP Purchaser and each owner of the DIP Purchaser's stock, which contained the following provision (the "***Release Provision***"):

Section 6.1 <u>Releases.</u> Each holder of the Corporation's capital stock that is a party to this Agreement . . . (each, a "Releasing Party"), hereby fully, finally and irrevocably releases, acquits and forever discharges each other Releasing Party from any and all . . . causes of action . . . based in whole or in part on any act, omission, transaction, event or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to [Appvion, the Bankruptcy Cases, the DIP Credit Agreement, among other matters].

82.    The Release Provision is an obvious attempt by Franklin to abuse its power over the DIP Purchaser and to require that KeyBank fully release Franklin from the claims and causes of action, including the counts alleging willful misconduct, asserted in the lawsuits related to Franklin's existing breach of the DIP Credit Agreement, including the original Complaint filed in the instant action.

83.    On May 22, 2018, counsel and representatives for, among others, Franklin, KeyBank, and Fifth Third held a conference call, during which KeyBank and Fifth Third asked Franklin to modify the Release Provisions, to which Franklin expressly stated: "We [Franklin and DIP Purchaser] are not dropping the release language in any way unless you drop the lawsuits." Franklin further stated that it would not modify even one provision to address the shareholder rights issues that KeyBank and Fifth Third raised in the Term Sheet Comments unless KeyBank and Fifth Third agreed to drop this litigation. Franklin also expressly stated that it would not countenance minority lenders to the DIP Purchaser sharing in the equity in the DIP Purchaser if they are suing Franklin.

84.    On May 29, 2018, KeyBank sent a letter to Franklin stating that Franklin, under the façade of the DIP Purchaser, cannot impose releases of lawsuits filed against it as a condition precedent to allowing KeyBank to share in the equity in the DIP Purchaser.

85.    On June 5, 2018, Franklin sent a letter to KeyBank reiterating that:

>    Fifth Third and KeyBank will receive their equity interests in Appvion Holdings in the same manner as all other equity holders: upon execution of the Stockholders Agreement. If Fifth Third and KeyBank choose not to execute the Stockholder Agreement, their equity interests will be preserved for their benefit pending resolution of whatever open issues remain among the parties.

86.    On June 12, 2018, the DIP Agent sent a letter to DIP Lenders, stating:

>    To the extent you have not already sent us your executed signature page, please note that each lender must sign and return the posted

> signature page to the Stockholders Agreement to permit a lender to receive its *pro rata* share of AHC's equity at closing, which may occur as early as tomorrow (June 13, 2018).

87.     On or about June 13, 2018, the transaction contemplated by the Revised Stalking Horse Purchase Agreement closed, materially preserving the Release Provision and without incorporating any substantive changes by KeyBank and Fifth Third raised in the Term Sheet Comments. Franklin's NM DIP Loans were paid in full immediately after the DIP Sale.

88.     KeyBank requested from DIP Purchaser the stock certificate and financial information related to the equity in which KeyBank holds a beneficial interest ("***Financial Information***") so that it could assess the value of its equity interests and attempt to sell them in the open market. DIP Purchaser, under the control of Franklin, refused to provide the Financial Information unless KeyBank executed the Stockholder Agreement.

89.     Unwilling to allow Franklin, through its control of DIP Purchaser, to hijack the issuance of equity and condition it upon KeyBank releasing this lawsuit against Franklin, KeyBank refused to sign the Stockholder Agreement. Franklin's actions effectively prevented KeyBank from selling its equity interests in the DIP Purchaser in the open market.

90.     Despite Franklin's strong-arm attempts and abuse of its power as majority lender and majority shareholder, KeyBank's and Fifth Third's claims against Franklin, once again, were reserved and preserved in the Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation filed on June 20, 2018 (the ***"Plan"***). Specifically, the Plan provided that "[n]otwithstanding anything in the [Plan]…to the contrary, the releases, exculpations, waivers and injunctions" provided in the Plan "shall not affect in any way" and "shall not . . . release[] or otherwise affect in any way" KeyBank and Fifth Third's claims against Franklin. (Docket No. 837-1, at Art. XII.G).

91.     On or about April 22, 2019, Franklin and DIP Purchaser finally agreed to produce limited financial information related to KeyBank's equity interests in DIP Purchaser after a lengthy negotiation process. Franklin, however, has continued to refuse to permit the appropriate changes to the Stockholder Agreement and the issuance of KeyBank's equity—to which it is entitled under the DIP Credit Agreement (and the Final DIP Financing Order, which approved the DIP Credit Agreement).

92.     Due to Franklin's bad faith, KeyBank's equity interests in the DIP Purchaser have been irreparably damaged. By refusing to provide the Financial Information, Franklin impaired KeyBank's ability to obtain fair market value for its *pro rata* share of its equity interests in the DIP Purchaser. Coupled with the absence of customary and reasonable minority owner protections, Franklin's actions through the DIP Purchaser devalued KeyBank's minority equity interests.

93.     Through the tactics described in the foregoing, Franklin breached the implied covenant of good faith and fair dealing under the DIP Credit Agreement (and the Final DIP Financing Order that approved the DIP Credit Agreement).

**J.      The Franklin Lenders Hold a Controlling Majority of the Equity in the DIP Purchaser and Have Used Such Control to the Prejudice of the Minority Lenders.**

94.     The Franklin Lenders and Franklin Advisers shared the same counsel in the Bankruptcy Cases and in the present litigation.

95.     The Franklin Lenders and Franklin Advisers are affiliated entities that have acted together in the Bankruptcy Cases and with respect to the wrongful attempts to force KeyBank to release its claims against Franklin and the wrongful refusal to issue the equity in the DIP Purchaser to which KeyBank is entitled.

96. The Franklin Lenders controlled the Agent at all relevant times. The Franklin Lenders also controlled the DIP Purchaser and its day-to-day activities at all relevant times. Without limiting the foregoing, the Franklin Lenders control the board of directors of the DIP Purchaser.

97. The Franklin Lenders, acting together and in concert, hold a controlling majority of the equity in the DIP Purchaser.

98. Acting together and in concert, the Franklin Lenders, by and through Franklin Advisers, exercised control over the DIP Purchaser by causing it wrongfully to demand that KeyBank release its claims against Franklin under the Stockholder Agreement and to demand that KeyBank grant such release as a condition to the issuance of equity to which KeyBank was entitled.

99. Acting together and in concert, the Franklin Lenders, by and through Franklin Advisers, exercised control over the DIP Purchaser by causing it not to issue or recognize the equity interest to which KeyBank is entitled, unless KeyBank agreed to waive its claim against Franklin.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT – DIP LOAN DOCUMENTS
### (against All Defendants)

100. Plaintiff repeats and realleges each of the foregoing allegations.

101. Each of the (a) Final DIP Financing Order, as a consent order negotiated and consented to by, among others, the Debtors, Franklin, and KeyBank, and (b) DIP Credit Agreement, are valid and legally enforceable contracts. Moreover, the provisions of those agreements that are the subject of this First Amended Complaint cannot be modified without Plaintiff's written consent.

102.    Plaintiff relied on the express terms of each of the Final DIP Financing Order and the DIP Credit Agreement, including with respect to Priming Lien Prohibition, Priming Lien Consent Rights, the Material Modification Consent Requirement, the *Pro Rata* Sharing Requirement, Principal and Payment Reduction Bar, Collateral Release Prohibition and the narrow scope of the Limited Seniority Exceptions, when it consented to the DIP Credit Agreement.

103.    As set forth above, the Defendants have breached the DIP Credit Agreement and the Final DIP Financing Order by (a) breaching the Priming Lien Prohibitions and Priming Lien Consent Rights of the Plaintiff (*see supra* at H(i)), (b) breaching the Plaintiff's Material Modification Consent Requirement (*see supra* at H(ii)), (c) breaching the *Pro Rata* Sharing Requirement (*see supra* at H(iii)), (d) breaching the Principal and Payment Reduction Bar (*see supra* at H(iv)), and (e) breaching the Collateral Release Prohibition (*see supra* at H(v)).

104.    Plaintiff has at all times performed and fulfilled all of its obligations under the DIP Credit Agreement and the Final DIP Financing Order, and all conditions precedent to the claims set forth herein have been performed, satisfied and/or waived.

105.    As a direct and proximate result of the breaches of the DIP Credit Agreement and the Final DIP Financing Order, Plaintiff has suffered damages in an amount to be proven at trial, including compensatory damages, plus interest, attorneys' fees, costs and expenses as permitted by the DIP Credit Agreement and the Final DIP Financing Order and applicable law.

## SECOND CLAIM FOR RELIEF

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against All Defendants)

106.    Plaintiff repeats and realleges each of the foregoing allegations.

107.    Defendants know that each of the DIP Credit Agreement and the Final DIP Financing Order is, as applicable, a valid and legally enforceable contract or consent order, and that their terms could not be modified (to the extent applicable to this First Amended Complaint) without Plaintiff's written consent.

108.    In this regard, upon the entry of the Final DIP Financing Order and the terms thereof becoming binding upon each of the DIP Lenders, the DIP Credit Agreement and the Final DIP Financing Order became binding and enforceable against each of the DIP Lenders subject to such syndicated loan agreements. As such, the forty-four (44) DIP Lenders are collectively considered to be a joint venture and are bound by the terms and provisions of the DIP Loan Documents.

109.    Under New York law, implicit in every contract, including the DIP Credit Agreement and the Final DIP Financing Order, is an implied covenant of good faith and fair dealing.

110.    In the case of the DIP Credit Agreement and the Final DIP Financing Order, the implied covenant of good faith and fair dealing required that the Defendants treat the Roll-Up Loans on equal footing (equally and ratably) with the NM DIP Loans, both of which are subsets of the DIP Loans.

111.    To improperly circumvent the duties and obligations imposed upon them by the DIP Credit Agreement and the Final DIP Financing Order, the Defendants devised a dubious and improper scheme to exercise their control over the DIP Agent / DIP Purchaser to effectuate much more favorable treatment for a subset of the DIP Loans – the NM DIP Loans – that only the six (6) Franklin NM DIP Lenders possess. Such actions by the Defendants have directly harmed KeyBank's interests.

112.   To subvert the requirements of the DIP Credit Agreement and the Final DIP Financing Order that ensured that all DIP Lenders would be treated fairly and in a non-discriminatory manner, the Defendants concocted a scheme to seek to bypass numerous protections provided under the DIP Credit Agreement and the Final DIP Financing Order so that they could obtain for themselves a disproportionately better recovery and treatment at the expense of KeyBank and Fifth Third.  Specifically, the Defendants formed a competing smaller joint venture-loan syndicate comprised of just the six (6) Franklin NM DIP Lenders. Under the guise of this smaller junta, those six Franklin NM DIP Lenders (six of the Defendants), under the common management of Franklin Advisers: (a) knowingly violated and improperly compromised numerous protections and terms of the existing DIP Loan Documents, including, without limitation, each of the terms and protections set forth in Paragraph 74 above; and (b) proposed a separate DIP Facility that would be used predominantly ($85 million out of $100 million) to roll-up and discriminatorily treat their own DIP Loans better than the remaining thirty-seven (37) members of the original DIP Lender bank group. Franklin's malicious intent is further evidenced by the fact that they originally sought to effect the same discriminatory treatment (benefitting themselves at the expense of every other DIP Lender, including Plaintiff) under the DIP Credit Agreement and the Final DIP Financing Order, but were temporarily thwarted when KeyBank and Fifth Third objected and identified numerous provisions barring such actions under the terms of such agreement and consent order. Now, the Defendants are causing breaches of the very same terms and provisions of the DIP Credit Agreement and the Final DIP Financing Order in an effort to obtain such biased treatment, but apparently allege that because they are now causing the breaches through their participation under a new facility the Defendants should be free from hindrances.

### THIRD CLAIM FOR RELIEF

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (Against All Defendants)

113.    Plaintiff repeats and realleges each of the foregoing allegations.

114.    Defendants know that each of the DIP Credit Agreement and the Final DIP Financing Order is, as applicable, a valid and legally enforceable contract or consent order, and that their terms could not be modified (to the extent applicable to this First Amended Complaint) without KeyBank's written consent.

115.    In this regard, upon the entry of the Final DIP Financing Order and the terms thereof becoming binding upon each of the DIP Lenders, the DIP Credit Agreement and the Final DIP Financing Order became binding and enforceable against each of the DIP Lenders subject to such syndicated loan agreements. As such, the forty-four (44) DIP Lenders are collectively considered to be a joint venture and are bound by the terms and provisions of the DIP Loan Documents.

116.    Under New York law, implicit in every contract, including the DIP Credit Agreement and the Final DIP Financing Order, is an implied covenant of good faith and fair dealing.

117.    In proposing and implementing the New Priming DIP Facility, Franklin, in its capacity as the controlling majority, had a duty to act in good faith and deal fairly regarding the (1) structure of the equity interests of the DIP Purchaser; and (2) delivery of such interests.

118.    To subvert the requirements of the DIP Credit Agreement and the Final DIP Financing Order that ensured that all DIP Lenders would be treated fairly and in a non-discriminatory manner, Franklin utilized its control over the DIP Purchaser and the power of the majority Lenders to confer a special benefit for itself to the detriment of KeyBank by

conditioning upon KeyBank's agreement to the Release Provision, (1) Franklin's agreement to negotiate for commercially reasonable minority shareholder rights that KeyBank raised related to the DIP Sale; and (2) the delivery of the minority equity instruments to KeyBank after the DIP Sale.

119.   This tactic effectively (1) conferred special treatment to Franklin that would not result naturally from its *pro rata* voting rights, and (2) wrongfully deprived KeyBank of its financial information rights related to the DIP Purchaser after the DIP Sale, damaging KeyBank's ability to value and market for sale its minority equity interests.

120.   The implied covenant of good faith and fair dealing is breached when a party frustrates the purpose of the contract, *e.g.*, by failing to perform the things necessary to carry out the purpose for which the contract was entered and to refrain from destroying or injuring the other party's right to receive the fruits of the contract.  The covenant encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.  Accordingly, Franklin breached the implied covenant of good faith and fair dealing under each of the DIP Credit Agreement and the Final DIP Financing Order.

121.   Defendants' actions were improper and performed with malice, with the intent of injuring Plaintiff.

122.   As a direct and proximate result of the breaches of the covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount to be proven at trial, including compensatory damages, plus interest, and attorneys' fees, costs and expenses as permitted by the DIP Credit Agreement and the Final DIP Financing Order and applicable law.

## FOURTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH CONTRACT
**(Against the Franklin NM DIP Lenders and Franklin Advisers as their manager)**

123.    Plaintiff repeats and realleges each of the foregoing allegations.

124.    Each of (a) the original bank group-joint venture comprised of the forty-four (44) DIP Lenders under the DIP Credit Agreement and the Final DIP Financing Order and (b) the new six (6) member loan consortium (the "***New Consortium***") comprised solely of the Franklin NM DIP Lenders are treated as separate limited purpose joint ventures, which are separate and distinct from each other.

125.    As the Defendants comprise both (a) all of the lenders under the New Consortium that provided the New Priming DIP Facility (who are managed by the same manager, Franklin Advisers) and (b) the Required Lenders under the original DIP Credit Agreement (who are also managed by the same manager, Franklin Advisers), each of the Defendants, as members of the New Consortium had full knowledge of the terms and conditions of the DIP Credit Agreement and the Final DIP Financing Order. In fact, Franklin Advisers was primarily responsible for negotiating the terms of both the original DIP Loan Documents and the New Priming DIP Loans.

126.    The Defendants, who solely comprise the New Consortium, knew that the New Priming DIP Credit Agreement they entered into would improperly interfere with the contractual rights of Plaintiff (and others) under the DIP Credit Agreement and the Final DIP Financing Order.

127.    Indeed, Defendants purposefully entered into the New Priming DIP Credit Agreement to intentionally interfere with Plaintiff's contractual rights under the DIP Credit Agreement and the Final DIP Financing Order. Such actions have injured the Plaintiff by causing the Plaintiff's DIP Loans to be subordinated to $100 million of senior debt (the vast majority of

which was previously *pari passu* with the Plaintiff's DIP Loans), with Plaintiff's DIP Loans now

likely being converted against its wishes into an illiquid, minority equity sliver.

128.   Accordingly, Defendants have tortiously interfered with Plaintiff's rights and

protections provided under the DIP Credit Agreement and the Final DIP Financing Order.

129.   As a direct and proximate result of the tortious interference with contract, Plaintiff

has suffered damages in an amount to be proven at trial, including compensatory damages, plus

interest, attorneys' fees, costs and expenses as permitted by law.

130.   In committing the foregoing wrongful acts, the Defendants have also acted with

malice, oppression, an intent to injure, and a willful and conscious disregard of the Plaintiff's

rights under the DIP Credit Agreement and the Final DIP Financing Order, entitling Plaintiff to

punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY
### (Against the Franklin Lenders)

131.   Plaintiff repeats and realleges each of the foregoing allegations.

132.   The Franklin Lenders, as the controlling majority stockholder in the DIP

Purchaser, owed fiduciary duties to the minority stockholders (which were the former minority

DIP lenders), including the Plaintiff.

133.   The Franklin Lenders breached their fiduciary duty to the Plaintiff by wrongfully

using their controlling interest in an attempt to force KeyBank to release its claims against

Franklin upon execution of the Stockholder Agreement.   Specifically, by exercising their

domination and control over the board of directors of the DIP Purchaser, the Franklin lenders

caused the DIP Purchaser to require that KeyBank release its claims against Franklin by and

upon execution of the Stockholder Agreement.   By doing so, the Franklin Lenders caused the

DIP Purchaser to refuse to issue the equity in the DIP Purchaser to which KeyBank is entitled, unless KeyBank waived its claims against Franklin.

134.   The Franklin Lenders also have wrongly deprived Plaintiff of its rights to information and to attend certain stockholder or board meetings.

135.   KeyBank has been denied its rights to financial and other information, which has (a) impeded KeyBank's ability to benefit from or sell its equity interest and (b) devalued such equity interest.  Plaintiff also has been denied the right to participate in stockholder and board meetings to protect its equity interest.

136.   To the extent the Franklin Lenders took any action to the unfair detriment of Plaintiff at stockholder or board meeting at which Plaintiff was wrongly deprived the opportunity to participate, such conduct constitutes a breach of fiduciary duty owed to Plaintiff as a minority stockholder.

137.   As a direct and proximate result of the breaches of fiduciary duties, Plaintiff has suffered damages in an amount to be proven at trial, including compensatory damages, plus interest, and attorneys' fees, costs and expenses.

## SIXTH CLAIM FOR RELIEF

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Franklin Advisers)**

138.   Plaintiff repeats and realleges each of the foregoing allegations.

139.   As indicated above, the Franklin Lenders, as the controlling majority stockholder in the DIP Purchaser, owed fiduciary duties to KeyBank.

140.   The Franklin Lenders breached their fiduciary duties to KeyBank by (a) attempting to force KeyBank to release its claims against Franklin by causing the DIP Purchaser to include a release of such claims in the Stockholder Agreement, (b) causing the DIP Purchaser to refuse to

issue the equity in the DIP Purchaser to which KeyBank is entitled, unless KeyBank waived its claims against Franklin, (c) refusing to provide information to KeyBank in an exercise to put further pressure on KeyBank to release its claims against Franklin, and (d) by taking any other unfair or inappropriate action at stockholder or board meetings at which Plaintiff was denied the opportunity to attend.

141.    KeyBank has been damaged by the Franklin Lenders' breach of fiduciary duty because, among other things, (a) the Franklin Lenders caused the DIP Purchaser to refuse to (1) issue the equity to which KeyBank is entitled and (2) provide information that KeyBank needs to maximize the value of its equity interest, and (b) KeyBank has been denied the opportunity to sell its equity interest for fair value and the right to participate in stockholder and board meetings to protect its equity interest.

142.    At all relevant times, Franklin Advisers acted in the capacity of an investment advisor to, and on behalf of, the Franklin Lenders.

143.    Franklin Advisers acted in its capacity as investment advisor and on behalf of the Franklin Lenders, in the attempt to force KeyBank to release its claims against Franklin upon execution of the Stockholder Agreement.

144.    Franklin Advisers also acted in its capacity as investment advisor and on behalf of the Franklin Lenders in causing the DIP Purchaser to refuse to issue the equity in the DIP Purchaser to which KeyBank is entitled and to attend stockholder and board meetings, unless KeyBank waived its claims against Franklin.

145.    Franklin Advisers knew that the Franklin Lenders, acting in concert, held a controlling majority of stock in the DIP Purchaser.

146.    Franklin Advisers knew that the conduct in which it was engaging, together with the Franklin Lenders, was wrongful.

147.    Franklin Advisers knowingly participated in the Franklin Lenders' breaches of fiduciary duties to the Plaintiff.

148.    As a direct and proximate result of Franklin Advisers' aiding and abetting the Franklin Lenders' breaches of fiduciary duties, Plaintiff has suffered damages in an amount to be proven at trial, including compensatory damages, plus interest, and attorneys' fees, costs and expenses.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

<u>**DECLARATORY JUDGMENT**</u>
**(Against All Defendants)**

149.    Plaintiff repeats and realleges each of the foregoing allegations.

150.    A justiciable controversy exists as to the status of the DIP Credit Agreement and the Final DIP Financing Order, whether the DIP Credit Agreement and the Final DIP Financing Order are binding and whether their terms supersede that of the New Priming DIP Credit Agreement.

151.    The DIP Loan Documents prohibit the priority liens and disparate treatment that Defendants seek to obtain under the New Priming DIP Credit Agreement.

152.    Here, each of the Franklin NM DIP Lenders are receiving full repayment of their NM DIP Loans under the existing DIP Credit Agreement and receiving New Priming DIP Loans that are being assumed by the Debtors. In contrast, each DIP Lender holding Roll-Up DIP Loans are being equitized (and not receiving cash payments and are not being assumed). Accordingly, each of the Franklin NM DIP Lenders is receiving a disproportionately larger payment on

account of the DIP Loans than any other DIP Lender, which is not permitted under the DIP Credit Agreement.

153.    Section 2.13 of the DIP Credit Agreement requires that any DIP Lender receiving a disproportionate payment on account of the DIP Loans must share its recoveries *pro rata* among all of the DIP Lenders.

154.    Each of the NM DIP Lenders reviewed and voluntarily executed the DIP Loan Documents.

155.    Further, the Final DIP Order binds each of the NM DIP Lenders to the terms and provisions of the DIP Loan Documents, including the *Pro Rata* Sharing Requirements of Section 2.13 of the DIP Credit Agreement.

156.    Plaintiff KeyBank thus seeks a declaratory judgment that:

(a)    The terms and provisions of the DIP Credit Agreement are binding and govern here;

(b)    Among the terms that the NM DIP Lenders agreed to are the provisions of Section 2.13 of the DIP Credit Agreement;

(c)    Pursuant to such provision, the NM DIP Lenders agreed to equally and ratably share any payments (and all other consideration) that they received that represented a proportionately larger share of payments than received by other DIP Lenders; and

(d)    The terms KeyBank raised in the Term Sheet Comments shall be adopted by Defendants, and where applicable, incorporated into the relevant equity documents in connection with the DIP Sale.

157.    Plaintiff thus hereby seeks entry of an order requiring the NM DIP Lenders (or any other necessary individuals/entities) to share, equally and ratably, any payments and other consideration (including, without limitation, the issuance of notes payable to the NM DIP Lenders and the proceeds thereof) that they received on account of any New Priming DIP Loans, any Exit Loans, and NM DIP Loans and/or other proceeds received at any time from such loans

or otherwise on account thereof in accordance with the requirements of Section 2.13 of the DIP

Credit Agreement.  Plaintiff further seeks entry of an order requiring the NM DIP Lenders (or

any other necessary individuals/entities) to adopt the Term Sheet Comments, and where

applicable, incorporate them into the relevant equity documents in connection with the DIP Sale.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor

and award Plaintiff the following relief:

(a)    an award of damages for breaches of contract according to proof;

(b)    an award of damages for breaches of the covenant of good faith and fair dealing according to proof;

(c)    an award of damages for tortious interference with contract according to proof;

(d)    declaratory relief requiring that the Defendants share, equally and ratably, any payments and other consideration (including, without limitation, the issuance of notes payable to the NM DIP Lenders and the proceeds thereof) received with the Plaintiff as a Roll-Up DIP Lender in accordance with Section 2.13 of the DIP Credit Agreement;

(e)    declaratory relief that the Franklin Lenders breached their fiduciary duties to the Plaintiff by using their controlling majority interest to cause the DIP Purchaser to (i) attempt to compel the Plaintiff to release its claims against Franklin as a condition to the issuance of equity in the DIP Purchaser to which Plaintiff was already entitled, (ii) refuse to issue such equity to Plaintiff unless it waived its claims against the Franklin Lenders, and (iii) deny Plaintiff access to information.

(f)    declaratory relief that Franklin Advisers aided and abetted the Franklin Defendants' breach of fiduciary duties to the Plaintiff;

(g)    declaratory relief requiring that the Defendants adopt the Term Sheet Comments, and where applicable, incorporate them into the relevant equity documents in connection with the DIP Sale;

(h)    compensatory damages according to proof;

(i)    consequential damages according to proof;

(j)    punitive damages according to proof;

(k)    attorneys' fees according to proof;

(l)    costs of suit incurred herein;

(m)    pre-judgment and post-judgment interest; and

(n)    such other and further relief as the Court deems just and proper.


Dated: New York, New York.                    Respectfully submitted,
        May 17, 2019
                                               **REED SMITH LLP**


OF COUNSEL                                     By: /s/ Kurt F. Gwynne_____
                                                   Kurt F. Gwynne
Peter S. Clark, Esquire                            Jonathan P. Gordon
Reed Smith LLP                                     599 Lexington Avenue
Three Logan Square, Suite 3100                     New York, New York 10022
1717 Arch Street                                   Telephone: (212) 521-5400
Philadelphia, PA  19103-7301                       E-mail:  kurt.gwynne@reedsmith.com
Telephone: (215) 851-8100                                    jonathan.gordon@reedsmith.com
E-mail: pclark@reedsmith.com

                                               *Attorneys for Plaintiff KeyBank National*
                                               *Association*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of May, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

Dated: New York, New York                           Respectfully submitted,
       May 17, 2019

**REED SMITH LLP**

By: /s/ Kurt F. Gwynne
       Kurt F. Gwynne

1201 N Market Street, Suite 1500
Wilmington, DE 19801
Tel. (302) 361-0533
Fax (302) 778-7575
Email: kgwynne@reedsmith.com