**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

| | | |
|---|---|---|
| **KEYBANK NATIONAL ASSOCIATION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | **Adv. Pro. No. 19-01104** |
| | : | |
| **FRANKLIN ADVISERS, INC.,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

------------------------------------------------------------x

| | | |
|---|---|---|
| **FIFTH THIRD BANK,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | **Adv. Pro. No. 19-01105** |
| | : | |
| **FRANKLIN ADVISERS, INC.,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

------------------------------------------------------------x

## DECISION ON DEFENDANTS' MOTION TO DISMISS

A P P E A R A N C E S :

REED SMITH LLP
*Attorneys for KeyBank National Association*
   By:   Kurt F. Gwynne
         Jonathan P. Gordon
         Peter S. Clark

O'MELVENY & MYERS LLP
*Attorneys for all Defendants*
   By:   Abby F. Rudzin
         Daniel S. Shamah

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

        KeyBank National Association ("**KeyBank**") was one of many lenders to Appvion, Inc.

both before and during Appvion's chapter 11 bankruptcy case in Delaware.  KeyBank claims

that other lenders (the "**Franklin Lenders**"), together with Franklin Advisers, Inc. ("**Franklin Advisers**"), took certain actions during Appvion's bankruptcy case that violated KeyBank's contractual and other rights.  KeyBank and another lender, Fifth Third Bank, sued the Franklin Lenders and Franklin Advisers in the New York State Supreme Court.  The defendants removed the actions to the United States District Court for the Southern District of New York, which denied motions to remand them to state court.  The District Court also denied a motion to transfer the actions to the District of Delaware, and then referred the actions to this Court.

Fifth Third Bank has since settled its claims.  KeyBank has filed a First Amended Complaint, and the defendants have moved to dismiss all claims asserted in the First Amended Complaint pursuant to Fed. R. Civ. P. 12, which is made applicable by Fed. R. Bankr. P. 7012.

## Jurisdiction, Venue and Power to Render a Final Decision

The District Court has held that jurisdiction and venue are proper in the Southern District of New York.  *See Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 224-36 (S.D.N.Y. 2019).  The parties disagree as to whether the asserted claims are within this Court's "core" jurisdiction but each party has consented to the entry of a final decision by this Court.  In light of the parties' consent this Court has the power to enter a final decision.  *See* 28 U.S.C. § 157(d); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015).

## Applicable Pleading Standards

In reviewing a motion to dismiss a court must accept the factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  However, the factual allegations in a complaint must be supported by more than mere conclusory statements.

*Twombly*, 550 U.S. at 555.  The allegations must be sufficient "to raise a right to relief above the

speculative level" and provide more than a "formulaic recitation of the elements of a cause of

action."  *Id*. (citations omitted).  "[O]nly a complaint that states a plausible claim for relief

survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id*. at 678 (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not a "probability

requirement," but it "asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Id*.  "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it

has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief."  *Id*. at 679; *see

also id*. at 682 (allegations are rejected where there is an "obvious alternative explanation" for

the conduct alleged that is more "likely") (internal quotation marks and citations omitted).

Various agreements, orders and other documents were attached to the First Amended

Complaint and were referred to in the First Amended Complaint, and it is proper for the Court to

consider those documents in ruling on the motion to dismiss.  *See Grant v. Cnty. of Erie*, 542 F.

App'x 21, 23 (2d Cir. 2013) (summary order) (in its review of a motion to dismiss "the court is

entitled to consider facts alleged in the complaint and documents attached to it or incorporated in

it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which

judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence");

*Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d. Cir. 2000) (it is proper to consider documents that

are quoted in, attached to or incorporated by reference into a complaint, or that plaintiff relied

upon in bringing suit); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d

759, 762 (2d Cir. 1991) (it is proper to consider a document upon which allegations are based, whether or not it is attached to the complaint). If an allegation is belied by the terms of the documents, the documents are controlling. *Id.; see also Alexander v. Bd. of Educ. of City of New York*, 648 F. App'x 118 (2d Cir. 2016) (summary order) (dismissing complaint where documents contradicted allegations).

## Background

Appvion Inc. and its affiliates were parties to three secured financings that preceded their October 1, 2017 bankruptcy filings. One financing (the "**Prepetition First Lien Financing**") was secured by first-priority liens and security interests in substantially all of the borrowers' assets. KeyBank and the Franklin Lenders were among the 44 lenders who made loans under the Prepetition First Lien Financing. KeyBank acted as the "documentation agent" for that financing. *See* Am. Compl. ¶ 17 [ECF No. 22]. About $253.3 million of loans were outstanding under the Prepetition First Lien Financing at the time of the bankruptcy filings. *Id.* ¶ 18.

A second financing (the "**Prepetition Second Lien Financing**") was secured by liens and security interests that with certain exceptions were junior only to the liens under the Prepetition First Lien Financing. *See* Ex. A to Am. Compl. ¶ E.(viii). More than $257 million was outstanding under the Prepetition Second Lien Financing at the time of the bankruptcy filings. *Id.* ¶ E.(iv). A third financing (the "**Prepetition Receivables Facility**") was secured by various receivables. *Id.* ¶ E.(vi).

Appvion arranged debtor-in-possession financing ("**DIP Financing**") to sustain its operations during its bankruptcy case. The Delaware Bankruptcy Court entered an interim order on October 3, 2017 that tentatively approved some terms of the DIP Financing. KeyBank alleges that it was not involved in the discussions that led to the initial financing that was the subject of

the interim order but that KeyBank participated in subsequent discussions, and those discussions led to modifications that were incorporated into a credit agreement that governed the DIP Financing (the "**DIP Credit Agreement**").  KeyBank also negotiated modifications to the form of order that approved the DIP Financing and that was entered by the Delaware Bankruptcy Court on October 31, 2017 (the "**2017 DIP Order**").  *See* Am. Compl. ¶¶ 19, 23 and Ex. A.

A.    **The Terms of the 2017 DIP Financing**

The approved 2017 DIP Financing contained the following features.

1.    **Roll-Up of Prepetition First Lien Debts.**  The outstanding loans under the Prepetition First Lien Financing were "rolled up" as part of the 2017 DIP Financing.  The "roll-up" meant that the pre-bankruptcy first-lien secured loans were converted into post-bankruptcy loans, with the result that the pre-bankruptcy first-lien lenders became DIP lenders.  Five million dollars of letter of credit obligations under the Prepetition First Lien Financing were not included in the "Roll-Up Loans" but instead were cash-collateralized.  2017 DIP Order ¶ 5(a).  The Prepetition Second Lien Financing and the Prepetition Receivables Facility were left in place.

The 2017 DIP Order approved the roll-up and provided that it would be effective no later than October 31, 2017.  The holders of the Roll-Up Loans were entitled to "all of the rights and obligations of a Lender and Roll-Up Lender (each as defined in the DIP Facility Agreement) under the DIP Facility Documents."  *Id.*

2.    **New Money DIP Loans.**  The new DIP Financing was $85 million larger than the amount of the Roll-Up Loans and thereby made "new money" available for use by Appvion (the "**New Money Loans**").  The pre-bankruptcy first-lien lenders had the option of participating in the new money portion of the DIP financing but were not required to do so, and KeyBank elected not to do so. *Id.* ¶¶ 19-22.

3.    **DIP First-Priority Liens and Superpriority Claims**.  The DIP liens were senior

to other liens and subordinate only to the rights of certain professionals to obtain payment of

their fees under an agreed "carve-out" provision.  The DIP Lenders were also granted

administrative "superpriority" claims, meaning that their claims to recover amounts owed would

be superior to any other administrative claims in the bankruptcy cases with the exception of the

agreed "carve-out" for professional fees.  2017 DIP Order ¶ 10.

4.    **Relative Priorities of the New Money Loans and Roll-Up Loans**.  Sections

2.17(d) and (e) of the DIP Credit Agreement provided generally that all of the DIP loans

(including the Roll-Up Loans) would be secured by first priority security interests and liens in

the Appvion Debtors' assets.  2017 DIP Order, Ex. A § 2.17.  These sections further provided

that the Roll-Up Loans and the New Money Loans would be entitled to the same priorities as to

such liens.  As a general matter section 2.17 preserved that parity with respect to the "proceeds

of any sale, transfer or other disposition of Collateral."  *Id.* § 2.17.  Section 2.13 of the DIP

Credit Agreement further provided that any DIP Lender who obtained a payment in excess of its

"ratable share" was required to so notify the Administrative Agent and to "make such

adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the

Lenders ratably . . ."  *Id.* § 2.13.  By its terms section 2.13 applied to any payment that a lender

received "by exercising any right of setoff or counterclaim *or otherwise*."  *Id.* (emphasis added).

Notwithstanding these general provisions, there were at least two circumstances under

which the New Money Loans were to have a payment priority over the Roll-Up Loans.

First, section 2.05(b)(ii) described certain "prepayments" of the DIP loans that were to be

mandatory if the borrowers received "Net Cash Proceeds" as the result of asset sales, the receipt

of insurance or condemnation awards, or the issuance of certain kinds of additional indebtedness.

Any prepayments required by section 2.05(b)(ii) were to be applied first to the New Money

Loans and only then to the Roll-Up Loans.  *Id.* § 2.05(b)(ii)-(iii).

Second, section 8.01 of the DIP Credit Agreement listed remedies that could be pursued

if an event of default occurred.  *Id.* § 8.01.  Section 8.02(a) stated that "[a]fter the exercise of

remedies" provided for in section 8.01, or after the Loans had "automatically become

immediately due and payable," any amounts received would be used to repay the New Money

Loans before any repayment towards the Roll-Up Loans.  *Id.* § 8.02(a).  Section 8.02(b) specified

that the order of priorities specified in section 8.02(a) "shall not be binding in any exit facility

that refinances the Obligations."  *Id.* § 8.02(b).

     **5.**       **<u>Adequate Protection to Prepetition Lenders and Agents</u>**.  Pursuant to sections

361 and 364 of the Bankruptcy Code the DIP Financing provided "adequate protection" to the

pre-bankruptcy secured lenders to protect them from the possibility that a use of their collateral,

or the grant of another lien, or a stay against disposition of their collateral resulted in a decline in

the value of their interest in the collateral.  The agents and lenders under the Prepetition First

Lien Financing were entitled to receive adequate protection in the form of replacement liens and

additional security interests in the DIP Collateral that were junior only to the DIP Liens, certain

permitted earlier liens, and the professional fee "carve-out."  *See* 2017 DIP Order ¶ 14.

However, as explained below the 2017 DIP Order also contemplated that the Prepetition First

Lien Obligations would be fully paid and therefore extinguished once the Roll-Up had been

completed and once a deadline had expired for the assertion of certain challenges to the

Prepetition First Lien Lenders' claims and liens.

     The Prepetition Second Lien agents and lenders also were entitled to receive adequate

protection against a diminution in the value of their collateral in the form of payments of their

advisors' expenses and in the form of additional liens. All of the various adequate protection liens were to be junior to the liens of the DIP lenders. *Id.*

      6.      **Challenge Period/Release of First Lien Agents and Claims.** The Roll-Up Loans were potentially subject to change in the event that a creditor filed a challenge to the validity or perfection of the liens that secured the pre-bankruptcy loans. The Delaware Bankruptcy Court set a December 17, 2017 deadline for such challenges (December 31, 2017 in the case of the statutory unsecured creditors' committee). *Id.* ¶¶ 34-35. The parties have not identified any such challenge and so far as this Court is aware no such challenge was filed.

      Paragraph 12 of the 2017 DIP Order provided that upon the indefeasible and irrevocable payment of amounts due under the Prepetition First Lien Financing the liens and security interests that supported that financing would be deemed to have been assigned to an agent acting on behalf of the DIP Lenders. Upon that deemed assignment the agents for the prepetition first lien lenders (including KeyBank as Prepetition Documentation Agent) were to be fully released from their obligations and were to have no further obligations. *Id.* ¶ 12. It appears that the Roll-Up of the Prepetition First Lien obligations became final and irrevocable once the challenge period expired, and that the prepetition agents were to have no further obligations after that date.

      7.      **Relevant Default Provisions.** The Appvion borrowers agreed in section 7.03 of the DIP Credit Agreement that with certain limited exceptions they would not "[c]reate, incur, assume or suffer to exist" any further Lien on their properties. *See* DIP Credit Agreement § 7.03. Section 8.01(t) of the agreement also provided that it would be a default if any "claim on Collateral" were granted that was *pari passu* with or senior to the Prepetition First Liens or the various adequate protection liens. *Id.* § 8.01(t). The Appvion borrowers also agreed in Section 7.25 of the DIP Credit Agreement that they would not "[i]ncur, create, assume, suffer to exist or

permit" any Superpriority Claim that would be senior to, or *pari passu* with, any of the DIP

Lenders' claims (with the exception of the agreed carve-out for professionals), and any grant of

such a *pari passu* or superior superpriority claim was to be a default under section 8.01(s) of the

DIP Credit Agreement. *Id*. §§ 7.25, 8.01(s).

       In addition, section 8.01(o)(vii) of the DIP Credit Agreement provided that it would be an

Event of Default if the Debtors, "without the prior written consent of the Administrative Agent

and the Required Lenders," were to seek an order authorizing a sale of all or substantially all

assets "unless such order contemplates payment in full in cash of the Obligations upon the

closing of such financing or consummation of such sale, whether pursuant to a plan of

reorganization or otherwise." *Id.* § 8.01(o)(vii).

       **8.**     <u>**Modifications or Amendments.**</u>  As a general matter the terms of the DIP Credit

Agreement could be modified or amended so long as the change was agreed to in writing by the

"Required Lenders," which term was defined as lenders holding more than 50% of the aggregate

sum of the outstanding Roll-Up Loans and New Money Loans and the unused New Money

commitments, excluding any such amount held, or deemed held, by a defaulting lender. *Id.* §§

1.01, 11.01.  However, certain provisions could not be waived or modified without the consent of

all affected lenders or, in some instances, with the consent of the Roll-Up Lenders.  More

particularly:

- Section 11.01(d) provided that there could be no principal reduction or waiver of amounts owed except with the consent of each Lender entitled to such amounts;

- Section 11.01(e)(i) stated that section 8.02 could not be modified "in a manner that would alter the pro rata sharing of payments required thereby" without the consent of each Lender;

- Section 11.01(e)(ii) stated that the order of application of a prepayment under section 2.05(b) could not be altered "in any manner that materially and adversely affects the Lenders hereunder without the written consent of the Required Lenders;"

- Section 11.01(f) prohibited any change to section 11.01, or any change to the definition of "Required Lenders," without the consent of each Lender;

- Section 11.01(g) prohibited the release of "all or substantially all" of the Collateral "in any transaction or series of related transactions" without the written consent of each Lender; and

- Section 11.01(i) prohibited any change to the terms of section 8.02(b) (the provision stating that the payment priority for New Money Loans after a default would not apply in connection with an Exit Financing) without the consent of each Roll-Up Lender.

**B.       Other Relevant Terms of the 2017 DIP Order**

The Debtors agreed to certain waivers that were incorporated in the 2017 DIP Order:

- In paragraph 45(a)(i) the Debtors irrevocably waived the right to seek, and agreed not to seek or to consent to ("directly or indirectly"), any amendments to the 2017 DIP Order "without the prior written consent of the DIP Agent, at the direction or with the consent of the Required Lenders, and the Prepetition First Lien Administrative Agent."  2017 DIP Order ¶ 45(a)(i).

- In paragraph 45(b) the Debtors irrevocably waived the right to seek any further order allowing the use of cash collateral or any lien on DIP Collateral with priority equal or superior to the "Senior Adequate Protection Lien" (*i.e.*, the adequate protection lien in favor of the Prepetition First Lien Lenders) except with the written consent of various

22

parties, including KeyBank as Prepetition Documentation Agent for the Prepetition

First Lien Financing.  *Id. ¶* 45(b).

- The Debtors also agreed generally not to seek modifications to the 2017 DIP Order
  without the prior written consents of the DIP Agent (acting at the direction or with the
  consent of the Required Lenders), the Prepetition First Lien Agents (including
  KeyBank as Prepetition Documentation Agent), and the Prepetition Second Lien
  Trustee and the unsecured creditors' committee, "as applicable," and agreed that no
  such consent would be implied.  *Id*. ¶ 45.

In addition, paragraph 13(b) of the 2017 DIP Order stated generally that "[o]ther than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted" in the Appvion cases.  *Id.* ¶ 13(b).  Paragraph 29(a) stated that, if the 2017 DIP Order were modified, amended or vacated by a subsequent order, that modification, amendment or vacatur "shall not affect the validity and enforceability of" the DIP Loans "or any lien, claim or priority authorized or created hereby."  *Id.* ¶ 29(a).  Finally, paragraph 49(a) of the 2017 DIP Order stated that "[e]xcept as expressly provided herein or in the DIP Facility Documents, no claim or lien having a priority senior to or *pari passu* with that granted by this Final Order to the DIP Secured Parties shall be granted while any portion of the DIP Obligations remains outstanding, and the DIP Liens shall not be . . . subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.  *Id*. ¶ 49(a).

## C.    The 2018 Modifications to the DIP Financing

On February 8, 2018, the Appvion Debtors filed a motion seeking approval of a sale transaction.  The motion outlined a transaction pursuant to which a new entity would be formed

by the Franklin Lenders to acquire the Debtors' assets.  As part of the transaction the amount of the New Money Loans would be increased by $15 million.  When the sale was consummated the buyer was to assume the obligations to repay all of the New Money Loans.  The Roll-Up Loans, however, were to be "credit bid" as part of the sale.  As a result the Roll-Up Lenders would receive equity interests in the buyer.  Am. Compl. ¶ 41.

KeyBank and Fifth Third objected to the proposed sale terms.  They argued that the proposed transaction would constitute an event of default under section 8.01(o)(vii) of the DIP Credit Agreement because the proposed sale would not result in a full repayment of all of the DIP Loans.  They also argued that the transaction would provide disparate treatment for different DIP Lenders in that the New Money Loans would be assumed by the buyer while the Roll-Up Loans would be converted to equity.  *See id.* ¶ 43.

In response, the Franklin Lenders and Franklin Advisers proposed a modified two-step structure that included a new debtor-in-possession loan as well as a sale transaction.  Under the revised proposal, a new debtor-in-possession loan was to be made in the amount of $100 million.  The new loan was to be a "priming" loan that would be backed by liens that would be superior to those that secured the original DIP Loans.  In addition, the $85 million of New Money Loans would be "rolled up" into the new priming facility.  As a result, the Appvion Debtors were to receive $15 million of additional loans, while the former New Money Loans would be converted into new obligations that under all circumstances would have higher lien priorities than the Roll-Up Loans.  The proposed sale transaction was also modified to provide that the new priming DIP loans would be assumed by the buyer, while still providing that the Roll-Up Loans would be credit bid and would be converted to equity.  *Id*. ¶¶ 45-46.

KeyBank and Fifth Third filed additional objections, arguing (among other things) that the approval of a new "priming" facility would violate various provisions of the DIP Credit Agreement and of the 2017 DIP Order. After a hearing on March 12, 2018, the Delaware Bankruptcy Court issued its interim approval of the new priming DIP facility. *Id.* ¶ 47. The Court stated, however, that its approval was without prejudice to claims that KeyBank might have against Franklin Advisors and the Franklin Lenders:

> I will say this, though, with respect to reservation of rights. The Court's concern here is whether the debtor has met its burden under 364 of the Bankruptcy Code. To the extent the banks think that Franklin here has breached the credit agreement, this order will be without prejudice for them to assert those claims in an appropriate forum, whether it's this or another one. And I don't think I need to get into it at this point because the Court's primary concern is in meeting the 364 requirements, which I think this record adequately supports.

Hr'g Tr. 83:14 – 83:23, Mar. 12, 2018 [Case No. 17-12082 (KJC) ECF No. 571]. The Delaware Bankruptcy Court entered an order that approved the new priming DIP facility on an interim basis but that also stated that "[n]otwithstanding anything herein to the contrary, the Interim Order is subject to the terms stated by the Court at the Interim Hearing, the transcript of which is incorporated herein by reference." *See* Am. Compl. ¶ 48; [Case No. 17-12082 (KJC) ECF No. 564, Rider B].

Subsequently, the Franklin Lenders and the Appvion Debtors negotiated and submitted a proposed credit agreement for the new priming DIP facility. The Franklin Lenders and Franklin Advisors, acting as the "Required Lenders," executed a "Waiver, Consent and Fourth Amendment to DIP Credit Agreement" under which they waived certain rights under the original DIP Credit Agreement and permitted the priming of the DIP Liens by the new proposed priming DIP facility. *Id.* ¶ 50. The "Required Lenders" also waived the provisions of section 2.05 to the extent that section 2.05 would have required a "mandatory prepayment" to anyone other than the

holders of the New Money Loans.  *See* Ex. B to Am. Compl., Ex. B ("Limited Waiver") § 2.1.

The waivers had the effect of leaving the mandatory prepayment provision in place as to a

portion of the new DIP financing equal to the New Money Loans (hence the "roll-up" of those

New Money Loans), but not as to the Roll-Up Loans.

The Bankruptcy Court gave its final approval to the priming DIP facility in an order

entered April 4, 2018 (the "**2018 DIP Order**"), a copy of which was submitted to the Court as

Exhibit 11 to the Declaration of Daniel S. Shamah in Support of the Defendants' Motion to

Dismiss.  [ECF No. 31-11].  Prior to that date KeyBank and Fifth Third had filed their lawsuits

against the Franklin Defendants in the New York State court, and the Delaware Bankruptcy

Court's order stated that it was without prejudice to the claims asserted in those lawsuits:

> Notwithstanding anything herein to the contrary, this Final Order and the
> findings at the Final Hearing are without prejudice to the claims and causes
> of action asserted or that may be asserted in the Supreme Court of New York
> for the County of New York in a civil action captioned (a) *KeyBank National
> Association vs. Franklin Advisors Inc., et al.,* Index No. 651517/2018 and (b)
> *Fifth Third Bank vs. Franklin Advisors, Inc., et al.,* Index No. 651518/2018
> (as may be amended, the "Litigations"), and any related defenses or
> counterclaims thereto; provided, however, that the plaintiffs in the Litigations
> agree that no claim or cause of action in the Litigations shall constitute a
> collateral attack on approval of the Senior DIP Facility, the Existing DIP
> Facility Documents, the Senior DIP Facility Documents, and the Final
> Existing DIP Order, all as amended.

*See* 2018 DIP Order ¶ 14.

**D.    <u>Subsequent Events</u>**

The transactions that were approved by the Delaware Bankruptcy Court entitled the Roll-

Up Lenders to receive shares of equity in the entity that acquired the Appvion assets.  KeyBank

alleges, however, that Franklin Advisers and the Franklin Lenders have used their control of the

buyer to prevent the issuance of stock to KeyBank unless and until KeyBank executes a

shareholder agreement that, among other things, includes a release of all claims that KeyBank

has against the Franklin entities.  Am. Compl. ¶¶ 71-91.

## The Asserted Claims and the Motion to Dismiss

KeyBank alleges that the defendants breached contracts to which KeyBank was a party

and/or breached implied contractual covenants of good faith and fair dealing when the

defendants arranged the modified DIP Financing and the modifications to the 2017 DIP Order.

KeyBank further contends that the defendants' use of their control of the Appvion buyer to

condition the delivery of stock to KeyBank upon a release of KeyBank's claims constitutes a

breach of a covenant of good faith and fair dealing and a breach of fiduciary duty.  In addition,

KeyBank alleges that the defendants tortiously interfered with the Debtors' contracts with

KeyBank.  Finally, KeyBank seeks a declaratory judgment as to its rights to share in recoveries

that the Franklin Lenders received on the New Money portions of their DIP Loans.

Defendants argue that KeyBank's claims are barred by the Delaware Bankruptcy Court's

prior orders and that KeyBank has failed to state a claim upon which relief may be granted.

## Discussion

I.    **Defendants' Collateral Estoppel and Res Judicata Arguments**

The defendants argue that the Delaware Bankruptcy Court could not have approved the

Senior DIP Facility, or the terms of the sale transactions, without also deciding that those

transactions did not violate KeyBank's contractual rights.  Defendants therefore contend that the

Delaware Bankruptcy Court's approval of the transactions necessarily means that the Debtors

and the Franklin Lenders did not breach any contract obligations.  These arguments are contrary

to the plain terms of the Delaware Bankruptcy Court's orders.  They also are based on

misconceptions about a bankruptcy court's role when it approves a financing or a sale.

A.    <u>**What A Bankruptcy Court Does When It Approves A Transaction**</u>

When it approves a financing or a sale, a bankruptcy court must determine whether the

transaction complies with relevant statutory requirements, including any creditor rights and

protections that are expressed in the Bankruptcy Code itself.  The bankruptcy court must also

determine whether the debtor has made a reasonable exercise of business judgment in deciding to

pursue the financing or other transaction.  *See, e.g., U.S. Bank Trust Nat'l Assoc. v. Am. Airlines,*

*Inc. (In re AMR Corp.)*, 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013)*, aff'd*, 730 F.3d 88 (2d Cir.

2013) ("[i]n determining whether to approve a debtor's request under Section 364, a Court must

examine whether the relief requested is an appropriate exercise of the debtor's business

judgment.")  However, transactions that are presented for approval are not barred just because

they may breach contracts.

Contracts impose legal obligations and breaches of contracts have legal consequences,

and contracts therefore should be taken seriously by persons who are parties to them.  The

consequences of a breach of contract may be important in deciding whether a transaction should

be approved and whether a reasonable business judgment has been exercised.  However, there

are times when breaching a contract is in the reasonable commercial interests of one of the

contracting parties.  Such a breach of contract is not something that the Bankruptcy Code

prohibits.  In fact, the Bankruptcy Code expressly contemplates that certain pre-bankruptcy

contracts may be "rejected" (an event that expressly constitutes a breach) when doing so is in the

better interests of the bankruptcy estate.  *See* 11 U.S.C. § 365.

Nor is a breach of contract an illegal act under state law.  *See People v. Patterson*, 135

A.D.2d 883, 883–84, 522 N.Y.S.2d 281, 282 (N.Y. App. Div. 1987) (attributing the higher

standard of proof required for larceny to the fact that, as a crime, larceny should not be confused

22

with actions that merely constitute a breach of contract); *People v. Alaboda*, 198 A.D. 41 (N.Y.

App. Div. 1921) ("[c]rime is not involved in a mere breach of contract, unless the Legislature has

clearly and unmistakably decreed that this shall be the result.")  As a general matter, a breach of

contract gives rise only to a right to collect damages, and not a right to an injunction against the

breach.  *See Express Shipping, Ltd. v. Gold*, 63 A.D.3d 669 (2d Dept. 2009) (specific

performance is not available where money damages would suffice); Restatement (2d) of

Contracts, § 359 (1981) (damages, and not specific performance or an injunction, are the usual

remedy).  If a court has refused to block a transaction in the face of a contention that a breach of

contract is about to occur, that does not mean (as defendants argue) that the court has necessarily

decided that there is no merit to the breach of contract claim.  That is particularly true when (as

here) the court has explicitly ruled that a damages claim may proceed.  The denial of an

injunction in such a case just means that the complaining party has been left to other remedies.

In these cases, the Delaware Bankruptcy Court's job in approving the transactions that

were presented to it was to consider whether the transactions complied with sections 363 and 364

of the Bankruptcy Code and whether they represented reasonable business judgments of the

Debtors -- *even if* that meant that the Debtors (or other parties) might be breaching other

contracts in the process.  I have read the transcripts that the parties have submitted and it is quite

clear that this is how the Delaware Bankruptcy Court perceived the issues before it.  The

Delaware Bankruptcy Judge approved the transactions as being in the interests of the Debtors

and in compliance with the requirements of the Bankruptcy Code, but at the same time stated

that he did not find it necessary to consider whether the transactions violated KeyBank's rights

against other lenders under the DIP Credit Agreement and/or the 2017 DIP Order.  That is why

his orders approved the transactions but stated that they were without prejudice to KeyBank's claims against the Franklin Lenders and Franklin Advisers.

If I were to infer from the Delaware Bankruptcy Court's orders that the approvals of the transactions necessarily included a determination by that court that KeyBank's contractual rights were not violated, I would be acting contrary to the explicit terms of that Court's orders. I would also be implying that the Delaware Bankruptcy Court made determinations that were not required by the motions that were before it, even though the Court said in the clearest possible terms that it was not doing so.

### B.    The Delaware Bankruptcy Court's Orders

Defendants point to various provisions of the Delaware Bankruptcy Court's orders in an effort to justify their contention that those orders foreclose KeyBank's claims, but the cited provisions are taken mostly out of context.

**1.    The 2018 DIP Order**.  Defendants first have cited to paragraph 2 of the Order that approved the Senior DIP Facility, which stated that "[s]ubject to the terms herein, all objections to and reservations of right with respect to the Motion and to the entry of this Final Order to the extent not withdrawn or resolved are hereby overruled on the merits in their entirety."  *See* 2018 DIP Order ¶ 2; Defs.' Mem. at 13 [ECF No. 30].  However, one of the other paragraphs in that same order – to which paragraph 2 was thereby "subject" – was the explicit statement in paragraph 14 that "[n]otwithstanding anything herein to the contrary, this Final Order and the findings at the Final Hearing are without prejudice to the claims and causes of action asserted or that may be asserted" by KeyBank in the New York state court action.  *See* 2018 DIP Order ¶ 14.  Defendants' contention that paragraph 2 of the 2018 DIP Order bars KeyBank's claims, notwithstanding paragraph 14 of that same Order, is absurd.

2.    **The 2018 Bidding Procedures Order**.  Defendants have also cited to a Bidding

Procedures Order that the Delaware Bankruptcy Court entered in March 2018, which stated that

all objections to the relief sought in a Bidding Procedures Motion were overruled "except as

reflected in the provisions of this Order."  *See* Decl. of Daniel Shamah, Ex. 8 ¶ 2 (the "**Bidding**

**Procedures Order**") [ECF No. 31-8]; Defs.' Mem. at 13.  However, the very next sentence in

that same paragraph ordered that *all* rights with respect to the proposed asset sale were preserved

"except those specifically related to the validity and structure of the Stalking Horse Purchase

Agreement."  Bidding Procedures Order ¶ 2.  In context, then, the objections that actually were

"overruled" by the Bidding Procedures Order were narrowly limited and did not encompass

KeyBank's claims about the defendants' violations of the DIP Credit Agreement.

The transcript of the proceedings before the Delaware Bankruptcy Court also makes it

clear that the Bidding Procedures Order did not resolve KeyBank's claims on the merits.  The

proposed bidding procedures and the initial objections to the proposed Senior DIP Facility were

heard the same day.  The Delaware Bankruptcy Court noted that the objections to the manner in

which the proceeds of a sale would be allocated were matters to be resolved at a later sale

hearing and not at the hearing on bidding procedures, and also noted that it did not need to

decide whether the proposed new financing violated KeyBank's contract rights.  *See* Hr'g Tr. 82,

March 12, 2018, Decl. of Daniel Shamah, Ex. 5 [ECF No. 31-5].  The Court stated:

> Allocation issues can be dealt with at the sale hearing.  I will say this, though,
> with respect to reservation of rights.  The Court's concern here is whether the
> debtor has met its burden under 364 of the Bankruptcy Code.  To the extent
> the banks think that Franklin here has breached the credit agreement, this
> order will be without prejudice for them to assert those claims in an
> appropriate forum, whether it's this or another one.  And I don't think I need
> to get into it at this point because the Court's primary concern is in meeting
> the 364 requirements, which I think this record adequately supports.

*Id.* The Delaware Bankruptcy Court then entered two separate orders that same day, one of which was the Bidding Procedures Order cited by defendants, and the other of which was the order granting interim approval to the Senior DIP Facility. The order that granted interim approval to the Senior DIP Facility stated that "[n]otwithstanding anything herein to the contrary, the Interim Order is subject to the terms stated by the Court at the Interim Hearing, the transcript of which is incorporated herein by reference." *See* Am. Compl. ¶ 48; [Case No. 17-12082 (KJC) ECF No. 564, Rider B].

In context, the contention that the Bidding Procedures Order foreclosed the claims that KeyBank is asserting in this action is without merit. The issues that were actually decided at the time the Bidding Procedures Order was entered were different issues. Issues that related to alleged breaches of the DIP Credit Agreement and the 2017 DIP Order were argued that same day and in the same hearing, and KeyBank's rights to pursue those claims were expressly reserved, both through the court's comments at the hearing and by the express language of the interim order that approved the Senior DIP Facility. The suggestion that the Delaware Bankruptcy Court somehow intended (through the Bidding Procedures Order) to extinguish claims about the DIP Facility that he had expressly reserved during the hearing, and that he expressly reserved in the separate interim order he entered that same day with respect to the proposed Senior DIP Facility, is not reasonable.

3.    **The 2018 Sale Approval Order**. Defendants also argue that the Delaware Bankruptcy Court held, in a later order that approved the sale, that the refinancing of the Senior DIP Obligations was "permitted under the terms of the DIP Credit Agreements and Loan Documents." *See* Decl. of Daniel Shamah, Ex. 13 ¶ X.B (the "**May 14, 2018 Sale Order**") [ECF No. 31-13]; Defs.' Mem. at 8. However, paragraph 39 of the same order stated as follows:

> ***Notwithstanding anything in this Sale Order to the contrary,*** this Sale Order
> and the findings at the hearing are without prejudice to the claims and causes
> of action asserted or that may be asserted (including claims that may be
> asserted against additional parties) in the Supreme Court of New York for the
> County of New York in a civil action captioned (a) *KeyBank National
> Association vs. Franklin Advisors, Inc., et al.,* Index No. 651517/2018 and (b)
> *Fifth Third Bank vs. Franklin Advisors, Inc., et al.,* Index No. 651518/2018,
> along with (c) any successor or related action(s) and as or such litigation(s)
> may be transferred or removed (as and if applicable) under applicable law,
> (as may be amended, the "Litigations"), and any related claims, rights,
> defenses or counterclaims thereto; *provided, however,* that the plaintiffs in
> the Litigations agree that no claim or cause of action in the Litigations shall
> constitute a collateral attack on any order of this Court (including, but not
> limited to, this Sale Order, the Initial DIP Order, the Senior DIP Order), the
> DIP Facility Documents (as defined in the Initial DIP Credit Agreement), or
> the Senior DIP Facility Documents (as defined in the Senior DIP Credit
> Agreement).

May 14, 2018 Sale Order ¶ 39 (emphasis added).  Defendants' contention that paragraph X.B of

the Sale Order bars KeyBank's claims is without merit in light of the plain language of paragraph

39 of the same order.

> **4.**     **Comments About Adequate Protection Rights**.  Finally, defendants point to

comments by the Delaware Bankruptcy Court to the effect that KeyBank's "adequate protection"

rights were not violated by the revised financing.  *See* Hr'g Tr. 81:17-82:12, March 12, 2018;

Defs.' Mem. at 6.  However, "adequate protection" rights are statutory rights (not contract

rights), and they attached to KeyBank's claims as a pre-bankruptcy lender (not its rights as a DIP

Lender).  Findings about the "adequate protection" of prepetition secured claims have nothing to

do with the issue of whether KeyBank's rights as a DIP Lender were violated.  In any event,

stray comments about collateral values and adequate protection did not constitute rulings on the

merits of KeyBank's contract claims, as the Delaware Bankruptcy Court emphasized repeatedly

that it was leaving those claims in place and was not ruling on their merits.

C.    **The Preservation of Defenses**

At the hearing on the motion to dismiss in this Court the defendants argued that the

Delaware Bankruptcy Court's orders also stated that they were without prejudice to any defenses

that the defendants might assert against KeyBank.  In the defendants' view, this means that the

orders were without prejudice to defendants' contention that KeyBank's claims are barred on *res*

*judicata* and collateral estoppel grounds.  Accordingly, in their view, this Court should hold that

KeyBank's claims are in fact barred.

Defendants' reading cannot possibly be right.  The gist of what defendants contend is that

the Delaware Bankruptcy Court's orders actually were "with prejudice" to KeyBank's claims,

even though that is the exact opposite of what the Delaware Bankruptcy Court repeatedly and

clearly said.  I cannot interpret a general reservation of "defenses" as nullifying the many clear

statements that the orders were without prejudice to KeyBank's claims.

D.    **Whether KeyBank's Contract Claims Are Barred As Collateral Attacks**

The Delaware Bankruptcy Court did say, in the 2018 DIP Order, that the reservation of

KeyBank's claims would not permit a "collateral attack" on the following matters:

(i)    the Delaware Bankruptcy Court's "approval" of the revised DIP Facility;

(ii)    the Delaware Bankruptcy Court's prior "approval" of the initial DIP Facility;

(iii)    the Delaware Bankruptcy Court's "approval" of the revised DIP documents; or

(iv)    the terms of the 2017 DIP Order.

2018 DIP Order ¶ 14.  It is important that the foregoing statements be kept in mind in evaluating

KeyBank's individual claims.  It is plain, however, that the Delaware Bankruptcy Court did not

believe that all of KeyBank's claims constituted impermissible "collateral attacks" of the kinds

listed in the 2018 DIP Order.  If that is what the Delaware Bankruptcy Court believed, then there

would have been no reason to say that the Orders were "without prejudice" to KeyBank's claims in the first place.

A "collateral attack" is an attack on an order that is made in a proceeding (other than a direct appeal) that is different from the proceeding in which the order was entered and that seeks to undo or nullify the order itself. *See Black's Law Dictionary* (11th ed. 2019). Here, KeyBank is not seeking to undo or to change the relevant orders. The claims it asserts merely seek damages from non-debtor parties. A judgment in KeyBank's favor in this proceeding would affect neither the Delaware Bankruptcy Court's orders nor the Debtors' transactions. In that context the present claims are not a "collateral attack" of the kind that the 2018 DIP Order prohibits.

Defendants acknowledged at oral argument that KeyBank's claims do not seek to undo the orders themselves, but they argued that KeyBank's claims would "reroute" the consideration that was exchanged as part of the transactions, and that such a "rerouting" would itself constitute collateral attacks on the approved transactions. Hr'g Tr. 9, Aug. 15, 2019 [ECF No. 38]. But the only "collateral attacks" that the Delaware Bankruptcy Court foreclosed were collateral attacks on the "approval" of the revised DIP Facility, or on the prior "approval" of the initial DIP Facility, or on the Delaware Bankruptcy Court's "approval" of the revised DIP documents, or on the terms of the 2017 DIP Order. There is nothing in the Delaware Bankruptcy Court's order that purported to forbid a "rerouting" of sale consideration. In fact, a "rerouting" of sale consideration was plainly one of the things that KeyBank sought to accomplish in its state court complaint, and the Delaware Bankruptcy Court stated explicitly that those claims could proceed.

Furthermore, as explained above, the "approvals" that the parties sought from the Delaware Bankruptcy Court, and that the court provided in its orders, related to the *Debtors'*

19-01104-mew    Doc 40    Filed 05/04/20    Entered 05/04/20 16:34:16    Main Document
Pg 24 of 49


participation in the transactions. Debtors require court approval to engage in certain transactions, but no Bankruptcy Court approval was needed as to other parties' participation in the transactions. Seeking damages from non-debtors, or "rerouting consideration" among non-debtor parties, is not a collateral attack on the Bankruptcy Court's orders or on the particular "approvals" – namely, approvals of the Debtors' participation in the transactions – that the parties sought and that the Delaware Bankruptcy Court actually provided.

If the Delaware Bankruptcy Court's references to "collateral attacks" were interpreted to mean that KeyBank could not sue the defendants for damages – because that would alter the payments that the defendants received as part of the prior transactions – that would entirely nullify the preservation of KeyBank's claims, and would render meaningless all of the many statements by the Delaware Bankruptcy Court that KeyBank's rights were being preserved.

### E.    Whether the Tortious Interference Claims Are Collateral Attacks

KeyBank's tortious interference with contract claims cannot succeed without a finding that the Appvion Debtors violated their own contractual obligations to KeyBank. *See NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621, 664 N.E.2d 492, 496, 641 N.Y.S.2d 581, 585 (N.Y. 1996). Again, however, I do not see that those claims (or that such a finding) would constitute a collateral attack on the Delaware Bankruptcy Court's "approval" of the revised DIP Facility, or on its prior "approval" of the initial DIP Facility, or on the Delaware Bankruptcy Court's "approval" of the revised DIP documents, or on the terms of the 2017 DIP Order – which are the only items that are subject to the "collateral attack" prohibition.

As stated at the outset of this section, the matters presented to the Delaware Bankruptcy Court required it to decide whether certain transactions were in the interests of the Debtors. The principle guiding the Court in contemplating the 2018 DIP transactions, therefore, was whether

22

they served the interests of the Debtors, not whether they violated the terms of the parties'

preexisting contracts.  Because nothing prevented the alleged contractual violations from

coexisting with the new financing, KeyBank's tortious interference claims (and its contentions

that the Debtors violated contracts) would not constitute a collateral attack on the Delaware

Bankruptcy Court's orders themselves.  KeyBank seeks relief only against the Franklin Lenders

and Franklin Advisors and does not seek (on any grounds) to undo any of the Delaware

Bankruptcy Court's orders or to force the Appvion Debtors to give up any consideration they

received in the transactions that the Delaware Bankruptcy Court approved.  Furthermore, the

tortious interference claims were included in the initial New York State complaints and the

Delaware Bankruptcy Court was aware of them when it issued the 2018 DIP Order.  If the

Delaware Bankruptcy Court believed that the tortious interference claim constituted an

impermissible "collateral attack," then the Court could and would have said so at the time.  It did

not do so.

> ### F.    <u>Whether Alleged Violations of the 2017 DIP Order Are Collateral Attacks</u>

KeyBank alleges that the portions of the 2017 DIP Order that barred senior liens and

senior superpriority claims were contractually binding on the other DIP Lenders and were

breached when the DIP Financing terms were altered in 2018.  Am. Compl. ¶¶ 28-29, 56-58.

Defendants argue that these claims are collateral attacks on the 2017 DIP Order and/or on the

2018 DIP Order.  Defs.' Mem. at 12-15.

If KeyBank were not merely making contractual arguments – if, for example, KeyBank

were to argue that the relevant parts of the 2017 DIP Order constituted an absolute prohibition

against superior liens that could neither be waived by the parties nor modified by the Delaware

Bankruptcy Court itself in a later order – then that particular contention would constitute an

impermissible collateral attack on the 2018 DIP Order, because the premise of the argument

would be that the Delaware Bankruptcy Court lacked the power to approve priming liens in the

2018 DIP Order.    But that is not what KeyBank is contending.

KeyBank has argued in this case that the relevant portions of the 2017 DIP Order

imposed contractual obligations in the Debtors and the DIP Lenders, and that the defendants

either breached their own obligations or caused the Debtors to breach their obligations.  The

questions of whether the 2017 DIP Order imposed contract obligations at all, and if so who the

contracting parties were, will require further consideration.  However, the power of the Delaware

Bankruptcy Court to approve the modified DIP Facility in 2018, and its power to amend its own

prior order, are not being challenged here.  KeyBank's contention that contract obligations were

breached by the other DIP Lenders is not a request that the Delaware Bankruptcy Court's orders

be negated and it is not a collateral attack on those orders.  In fact, these particular contractual

claims were asserted in the original complaint in the New York State Court, and the Delaware

Bankruptcy Court ruled that they could be pursued.

*        *        *        *

For the foregoing reasons, defendants' contentions that KeyBank's claims are barred by

the Delaware Bankruptcy Court's prior orders is without merit.

## II.    **The Breach of Contract Claims**

KeyBank argues that the modified DIP Financing breached express contract terms in the

DIP Credit Agreement and the 2017 DIP Order.  It also alleges that the defendants breached

implied covenants of good faith and fair dealing by engineering a sham transaction that

artificially treated a new $15 million priming DIP loan as though it were actually a new $100

million priming DIP loan.  KeyBank argues that the extra $85 million of priming loans, and the

purported repayment of the New Money Loans, had no real economic substance or purpose and

22

were just an effort to negate the Roll-Up Lenders' rights to equal treatment in connection with a plan of reorganization.

KeyBank's contract claims are at times elusive, as the arguments in its papers often rely on characterizations of groups of contract provisions and are sometimes difficult to match up with specific contract terms. During oral argument it was also sometimes difficult to separate the express breach of contract arguments from the "good faith" arguments. For purposes of ruling on the motion to dismiss I have attempted to address each of the arguments separately below.

### A.    Whether the 2017 DIP Order Imposed Contract Obligations

Many of KeyBank's contract claims are based on contentions that other parties violated provisions in the 2017 DIP Order as well as provisions in the DIP Credit Agreement. KeyBank argued that the parties negotiated the terms of the 2017 DIP Order and that the order was entered upon consent. KeyBank also cited to cases involving the interpretation of "consent orders" generally (Pl's. Mem. in Opposition at 22), in which courts have held that since negotiated consent orders "have many of the attributes of ordinary contracts, they should be construed basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation." *United States v. ITT Continental Banking Co.*, 420 U.S. 223, 237 (1975); *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) (holding that the commands of a consent order must be found "within its four corners" and not from the alleged "purposes" of the parties). On that basis, KeyBank contends that the 2017 DIP Order itself should be treated as a "contract," such that any violation of its terms gave rise to a contractual claim by KeyBank against the Franklin Lenders.

Defendants did not generally challenge KeyBank's allegation that the 2017 DIP Order was a "contract" in their motion to dismiss, though they did argue that certain obligations were

only obligations belonging to the Appvion borrowers and not to the other DIP Lenders.  The

Court nevertheless asked for further information about the parties' positions at oral argument.  At

that time, KeyBank's counsel agreed that an order does not give rise to a contract just because

parties have agreed to its terms.  However, KeyBank argued that in the case of DIP orders

generally (and in the case of the 2017 DIP Order in particular) the orders are intended to modify

underlying contracts and that the orders themselves should be treated as contracts.  Hr'g Tr. 19,

Aug. 15, 2019.

Defendants' position on the issue was less clear.  Defendants' counsel agreed at oral

argument that the Appvion Debtors took on unspecified contractual obligations in the 2017 DIP

Order, but was equivocal as to whether DIP Lenders took on contractual obligations to each

other.  *See id.* at 11, 37.

Paragraph 36 of the 2017 DIP Order states that "[e]xcept as explicitly provided for

herein, this Final Order does not create any rights for the benefit of any third party, creditor,

equity holder or any direct, indirect or incidental beneficiary."  *See* 2017 DIP Order ¶ 36.  There

are no explicit statements in the 2017 DIP Order that any of its terms are to be enforceable as

contract obligations that one lender may enforce against other lenders.  On the other hand, at

least three provisions of the 2017 DIP Order indicate that the terms of the DIP Credit Agreement

and/or the prepetition loan agreements may have been modified by the 2017 DIP Order – though

none of those paragraphs identifies any specific terms that were so modified.  *See* 2017 DIP

Order ¶¶ 2, 14(b), 47.  The 2017 DIP Order also states generally that "[i]n the event of any

inconsistency between the terms and conditions of the DIP Facility Documents or this Final

Order, the provisions of this Final Order shall govern and control."  *Id*. ¶ 46.

Since the defendants did not argue generally that the terms of the 2017 DIP Order could not be considered to be a "contract" it is not necessary or proper to rule on that issue in connection with the motion to dismiss, though I will consider defendants' arguments as to whether particular terms of the DIP Order (even if they are contractual) can properly be construed in the manner alleged by KeyBank.

**B.    Whether Priming Liens Were Contractually Prohibited**

KeyBank's first contract argument is that any agreement to permit priming liens – or at least, any agreement to do so without KeyBank's consent – was a violation of KeyBank's contract rights.  The only provisions in the DIP Credit Agreement that were cited in support of this argument are the covenants by the Appvion Debtors that that they would not incur, create, assume, suffer to exist or permit any lien or any Superpriority Claim that would be senior to, or *pari passu* with, any of the DIP Lenders' liens and claims (with the exception of the agreed carve-out for professionals).  *See* DIP Credit Agreement § 7.25.  This contractual commitment plainly was a promise that was made only by the Appvion Debtors in favor of the DIP Lenders as a whole.  It was not a promise that the individual DIP Lenders made to each other, and cannot fairly be construed in that manner.  The Court will separately consider whether the Debtors' alleged breach of this covenant supports a claim of tortious interference, but the covenant in section 7.25 does not impose contractual obligations on the other DIP Lenders and cannot support a breach of contract claim by one DIP Lender against other DIP Lenders.

KeyBank also cited to various provisions in the 2017 DIP Order (including paragraph 45) under which the Debtors agreed that they would not seek "priming" liens and would not seek material modifications to the DIP Financing.  At oral argument, however, KeyBank's counsel acknowledged that these provisions only imposed contract obligations on the Debtors, and not on other lenders.  Hr'g Tr. 21:6, Aug. 19, 2019.  Again, these items may be relevant to KeyBank's

22

tortious interference with contract claims, but they do not support contentions that the defendants breached contract obligations of their own.

KeyBank's remaining contract claims about priming liens are based on the following three provisions in the 2017 DIP Order:

- Paragraph 13(b), which states that "[o]ther than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted" in the cases;

- Paragraph 29(a), which states that if the 2017 DIP Order is modified, amended or vacated by a subsequent order, that modification, amendment or vacatur "shall not affect the validity and enforceability of" the DIP Loans "or any lien, claim or priority authorized or created hereby;" and

- Paragraph 49(a), which states that "[e]xcept as expressly provided herein or in the DIP Facility Documents, no claim or lien having a priority senior to or *pari passu* with that granted by this Final Order to the DIP Secured Parties shall be granted while any portion of the DIP Obligations remains outstanding, and the DIP Liens shall not be . . . subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise."

*See* 2017 DIP Order ¶¶ 13(b), 29(a), 49(a).  For the reasons stated above, KeyBank is foreclosed from arguing that these provisions constituted a general prohibition on priming liens that the parties could not waive and that the Delaware Bankruptcy Court itself could not alter, because such an argument would constitute a collateral attack on the 2018 DIP Order itself.  However, that leaves open KeyBank's contentions that these provisions in the 2017 DIP Order imposed contract obligations that other DIP Lenders violated when they agreed to allow priming liens.

The main problem with KeyBank's contract arguments is that the various "no priming lien" provisions of the 2017 DIP Order protected the DIP Lenders as a whole. Contract rights are waivable, and the issue of whether the DIP Lenders as a whole possessed certain contract rights (here, a right to block priming liens) is different from the question of who had authority, among the DIP Lenders, to waive such contract rights. Section 11.01 of the DIP Credit Agreement states that the "Required Lenders" may modify or waive terms of any of the "Loan Documents" on behalf of all of the DIP Lenders, and the definition of "Loan Documents" explicitly includes the 2017 DIP Order itself. *See* DIP Credit Agreement §§ 1.01, 11.01. The plain language of the DIP Credit Agreement therefore gives the Required Lenders the right to waive or to agree to modify the terms of the 2017 DIP Order on behalf of the DIP Lenders as a group. Section 11.01 of the DIP Credit Agreement lists some matters that require individual consents and that cannot be done just with the approval of the Required Lenders, but there is no provision in section 11.01, or elsewhere in the DIP Credit Agreement itself, that purports to prevent the Required Lenders from agreeing to the allowance of priming liens.

KeyBank contends that the intent of the cited provisions in the 2017 DIP Order was to override the provisions in the DIP Credit Agreement as to what the "Required Lenders" could do, and thereby to require unanimous consent of all Lenders (not just action by the Required Lenders) before priming liens could be approved. Hr'g Tr. 23:22, Aug. 15, 2019. But if that is what the parties had really intended, they would have said so explicitly. There is nothing in the 2017 DIP Order that purports to require the unanimous consent of all DIP Lenders before a restriction on priming liens could be waived, or that purports to override the provisions of section 11.01 of the DIP Credit Agreement regarding the manner in which modifications or waivers generally may be approved. I note that there is a reference to potential modifications or

amendments to the 2017 DIP Order in paragraph 45 of that order, and it states that the Appvion

Debtors waived their rights to seek any material amendment, modification or extension without

the prior written consent of various parties, including "the DIP Agent, at the direction or with the

consent of the Required Lenders."  2017 DIP Order ¶ 45.  The plain import of this language,

insofar as the DIP Lenders are concerned, is that the "Required Lenders" continued to have the

right to make determinations on behalf of the DIP Lenders as a whole.

KeyBank's argument that the defendants (and the Required Lenders) did not act in good

faith in the manner in which they purported to exercise contractual rights is a matter that is to be

considered separately below.  But KeyBank's contention that the Required Lenders were

contractually forbidden from agreeing to any priming liens under any circumstances except with

the unanimous consent of all of the DIP Lenders is without merit.  There is no provision in the

parties' contracts or in the 2017 DIP Order that purports to require such unanimous consent.

### C.    Alleged Breach of Priming Lien Consent Rights

In paragraph 45(b) of the 2017 DIP Order, the Debtors irrevocably waived the right to

seek any further order allowing the use of cash collateral or any lien on DIP Collateral with

priority equal or superior to the "Senior Adequate Protection Lien" (*i.e.*, the adequate protection

lien in favor of the Prepetition First Lien Lenders) except with the written consent of various

parties, including KeyBank as Prepetition Documentation Agent for the Prepetition First Lien

Financing.  *Id.* ¶ 45(b).  KeyBank contends that this provision of the DIP Order required

KeyBank's consent before any priming liens of any kind could be granted.

By its terms, however, paragraph 45(b) of the 2017 DIP Order is only a covenant made

on behalf of the Debtors themselves.  KeyBank's counsel acknowledged during oral argument

that this paragraph does not impose contractual obligations on other DIP Lenders.  Hr'g Tr. 21:6,

Aug. 15, 2019.

Even without KeyBank's concession the claim would be fatally flawed.  The provision

cited by KeyBank in the First Amended Complaint is a provision that addresses the adequate

protection rights of the Prepetition First Lien Lenders, *not* the rights of KeyBank as a DIP

Lender.  As noted above, the DIP Financing and the 2017 DIP Order contemplated that the

obligations owed to the Prepetition First Lien Lenders would be repaid in full as part of the DIP

Financing.  They also contemplated that the repayment would be irrevocable and complete once

the "Challenge Period" expired, at which point all liens of the Prepetition First Lien Lenders

would be deemed to have been assigned to the DIP Lenders and the obligations of the Prepetition

Agents (including KeyBank as Prepetition Documentation Agent) would terminate.  The

Challenge Period expired before the proposed modifications to the DIP Financing, and so the

prepetition liens and adequate protection liens of the First Lien Lenders had been extinguished.

No consent to a priming of the First Lien Lenders' adequate protection liens was needed because

the Prepetition First Lien Lenders no longer possessed any such liens or any rights to adequate

protection, and so KeyBank's "consent" to such a hypothetical priming was not needed.

To the extent that KeyBank sought (in its First Amended Complaint) to treat the relevant

provision in the 2017 DIP Order as giving KeyBank an individual veto (as a DIP Lender) over

any priming of the DIP Lenders' liens, that argument is inconsistent with the plain wording of

the relevant provision.  KeyBank is not pursuing claims here in its capacity as a documentation

agent for other First Lien Lenders.  It is pursuing claims in a different capacity (as a Roll-Up DIP

Lender), and nothing in the DIP Credit Agreement or the 2017 DIP Order purports to require

KeyBank's individual consent (as a Roll-Up Lender) to priming liens.

22

### D.    Alleged Breach of "Material Modification Consent Rights"

The last sentence of paragraph 45 of the 2017 DIP Order stated that the Debtors agreed

not to seek modifications to the 2017 DIP Order without the prior written consents of the DIP

Agent (acting at the direction or with the consent of the Required Lenders), the Prepetition First

Lien Agents (including KeyBank as Prepetition Documentation Agent), and the Prepetition

Second Lien Trustee and the unsecured creditors' committee, "as applicable."  2017 DIP Order ¶

45.  KeyBank alleged in its First Amended Complaint that defendants had breached this

provision, but at oral argument KeyBank's counsel agreed that the provision only imposed

contractual obligations on the Debtors and not on the other DIP Lenders.  This provision

therefore cannot form the basis of a breach of contract claim by KeyBank against the other DIP

Lenders.

Even without KeyBank's concession, however, this claim would also be flawed.  The

cited provision only set forth rights that KeyBank might have in its capacity as "Prepetition

Documentation Agent," and even then only to the extent "applicable" in a particular situation.

The Prepetition First Lien financing was paid off long prior to the 2018 DIP Financing, and

KeyBank's obligations as Documentation Agent terminated at that time.  KeyBank cannot

reasonably interpret the last sentence of paragraph 45 as giving KeyBank an individual right in a

different capacity (as a Roll-Up DIP Lender) to consent to material modifications of the DIP

facility.

### E.    Alleged Violations of Rights to a *Pro Rata* Sharing of Loan Proceeds

The transaction challenged by KeyBank includes a purported $100 million "new"

financing.  As noted above, KeyBank contends that the financing was in reality just a $15 million

financing and the rest was a sham that was designed to evade various provisions of the DIP

Credit Agreement and the 2017 DIP Order.  KeyBank also argues, however, that even if the

financing were legitimate the defendants violated KeyBank's rights to a *pro rata* sharing of loan proceeds.

Section 2.05(b) of the DIP Credit Agreement states that in the event of a new financing the Debtors were required to use all of the "Net Cash Proceeds" to repay the DIP Loans.  In that case, however, the New Money Loans were to be paid first, and any balance was to be applied to the payment of the Roll-Up Loans.  In the 2018 transactions the Required Lenders agreed that the $85 million of New Money Loans would be deemed to have been repaid by virtue of being rolled up into the "new" financing, but they also waived any requirement that the $15 million of extra proceeds be applied to the repayment of the Roll-Up Loans.  *See* Limited Waiver § 2.1.

KeyBank argues that the new DIP financing, when combined with the later sale and the terms of the later plan of reorganization, had the effect of making different distributions to the New Money Lenders and the Roll-Up Lenders.  *See* Am. Compl. ¶¶ 61-63.  It contends that section 2.05 of the DIP Credit Agreement applied only to the extent there were actual "Net Cash Proceeds" from the 2018 financing.  The DIP Credit Agreement defines "Net Cash Proceeds" as "cash and Cash Equivalents received in connection with" a financing or other transaction in excess of taxes, fees, expenses and principal amount of indebtedness incurred as a result of the transaction.  KeyBank argues that in fact the only cash proceeds from the financing were the $15 million of new money that was made available to the Debtors and that the Lenders agreed that the Debtors could retain.  The remaining $85 million of "deemed" payments under the 2018 DIP Financing, according to KeyBank, were not real payments of "cash" at all, but instead were just thinly-disguised ruses upon which to give a new set of priority liens to the existing New Money Lenders.  KeyBank's contention is asserted both as a breach of contract claim and as part of KeyBank's arguments that defendants violated contractual duties of good faith and fair dealing.

I cannot tell from the record before me whether there were actual "Net Cash Proceeds" from the 2018 DIP Financing to which the New Money Lenders had priority rights. KeyBank contends that in the absence of "Net Cash Proceeds" any roll-up of DIP Loans into the new priming facility in 2018 had to be applied ratably to all DIP Lenders and not just reserved for the New Money Lenders. I find that this particular contention states a claim for breach of express contract, without making any ruling as to the merits of such a claim.

KeyBank also contends that the priming DIP facility was in reality an "exit financing." It contends that all of the transactions that were accomplished in 2018 were interrelated and that it was intended and expected from the outset that the priming obligations under the 2018 DIP would be assumed in the exit financing, while other obligations were left behind. KeyBank contends that this outcome breached section 8.02(b) of the DIP Credit Agreement, which made clear that the payment priorities in favor of the New Money Lenders would not be applicable in the case of an exit financing. This contention also states a valid claim for relief that cannot be dismissed at the pleading stage.

Defendants argue that section 2.13 of the DIP Credit Agreement (which obligates individual lenders to share, with other lenders, any disproportionate payments that they receive) only applies to situations in which individual Lenders have exercised setoff rights or asserted individual counterclaims. Defs.' Mem. at 20. However, section 2.13 by its terms provides that lenders must share disproportionate recoveries that they obtain by exercising any right of setoff or counterclaim "or otherwise." DIP Credit Agreement § 2.13. There is therefore no merit to defendants' contention that section 2.13 is limited to setoffs and counterclaims. If KeyBank prevails on contract claims that survive a motion to dismiss, then its contention that section 2.13 requires a sharing with other Lenders also survives a motion to dismiss.

In their papers the defendants asserted that the Debtors were in default under the DIP
Credit Agreement and that under section 8.02(a) of the DIP Credit Agreement the New Money
Lenders were entitled to a payment priority by the time the 2018 DIP amendments were
approved.  Defs.' Mem. at 18.  However, section 8.02(a) only applied after a declaration of
default and after an exercise of remedies.  Here, there admittedly was no declaration of default
and no exercise of remedies.  To the contrary: defendants' counsel acknowledged that in fact any
existing defaults were waived.  The provisions of section 8.02(a) therefore are not relevant to this
issue.

Finally, defendants argued that the Sale of all of the Debtors' assets accelerated the
amounts due under the DIP Credit Agreement and triggered a priority payment waterfall in favor
of the New Money Lenders under sections 2.05(b)(iii) and 8.02(a) of the DIP Credit Agreement.
*Id.*  But the "Sale" post-dated the DIP Financing by several months.  At the time of the 2018 DIP
Financing (and the purported "repayment" of the New Money Loans) no Sale had occurred and
no "Net Cash Proceeds" of a Sale were being distributed.  These provisions therefore are not
relevant to KeyBank's claims or to the motion to dismiss.

### F.    Alleged Breach of "Principal and Payment Reduction Bar"

Section 11.01(d) of the DIP Credit Agreement states that the Required Lenders could not
agree to reduce principal or interest or amounts payable without written consent of each Lender
entitled to such amount, except that Required Lenders could change or waive interest rate
obligations under 2.08(b).  *See* DIP Credit Agreement § 11.01(d).  KeyBank contends that this
provision was breached when other DIP Lenders purported to agree, without KeyBank's consent,
to segregate the Roll-Up DIP loans from the 2018 DIP and subsequently convert those
obligations to equity.  *See* Am. Compl. ¶¶ 64-66; Pl's. Mem. in Opposition at 22.

Defendants' sole response is that the new priming DIP facility did not itself result in a
release of payment obligations owed to KeyBank.  Defs.' Mem. at 20-21.  But KeyBank's
contention is that the priming DIP facility, the later Sale, and the termination of the Debtors'
payment obligations with respect to the Roll-Up DIP Lenders were all part of a series of
integrated transactions that were conditioned on each other and that should be considered
together in deciding whether contractual obligations were breached.  KeyBank's contentions
state a plausible claim and cannot be dismissed at this stage.

### G.    Alleged Breach of Collateral Release Provisions

KeyBank alleges that the defendants breached contractual obligations by agreeing to
release liens and security interests that secured the claims of KeyBank and other Roll-Up
Lenders.  Am. Compl. ¶¶ 67-69.  KeyBank relies on section 11.01(g) of the DIP Credit
Agreement, which states that the Required Lenders could not agree to "release all or
substantially all of the Collateral in any transaction or series of related transactions, without
written consent of each Lender."  Id. ¶ 34; DIP Credit Agreement § 11.01(g).  KeyBank alleges
that the Sale of the Appvion Debtors' assets and the modification of the DIP in 2018 were a
"series of related transactions" that had the effect of causing the DIP Collateral to be released
from the Roll-Up Lenders' liens and security interests even though the Roll-Up Loans were not
being paid in full and even though not all Lenders consented to this outcome.  Am. Compl. ¶ 67

Defendants argue that the new priming DIP facility in 2018 did not itself result in a
release of the DIP Lenders' liens on Collateral.  Defs.' Mem. at 20-21.  But section 11.01(g) of
the DIP Credit Agreement requires consideration of whether Collateral was released "in any
transaction or series of transactions" without the consent of each Lender.  KeyBank has properly

alleged that liens on the Collateral were released without the consent of KeyBank, and that contention states a valid claim that survives a motion to dismiss.

During oral argument the defendants argued also that the "collateral release" provision only prohibited transfers by the Appvion Debtors of the property that constituted collateral, rather than releases of the Lenders' liens on such collateral. Hr'g Tr. 70-71, Aug. 15, 2019. Frankly, this argument makes no sense. The Lenders did not own the property and did not have power to transfer it. A provision in a loan agreement that applies to "releases of collateral" by the Lenders can only reasonably be interpreted as a provision relating to the release of such collateral from the Lenders' liens and security interests. Furthermore, the series of transactions that KeyBank has challenged did result in a transfer of collateral from the Debtors to the buyer that the Franklin Entities had set up, and the collateral was freed of the Roll-Up Lenders' liens and security interests in connection with that transfer.

Defendants have contended that the Roll-Up Lenders received the equity in the buyer and this was somehow the equivalent of their prior security interests and liens. *Id.* at 71. One may question, if that were true, just why the defendants have fought so hard to differentiate between the treatment that was afforded to the New Money Lenders and the Roll-Up Lenders. In any event, no one – particularly anyone who is experienced in bankruptcy practice – can reasonably argue that having an equity ownership in an entity, which by definition is junior to the claims of all creditors, is necessarily the same as having a perfected first-priority security interest in the entity's properties. If defendants wish to contest the amount of damages that would be associated with this particular claim, that is an issue for trial and not a ground for dismissal.

## III.    KeyBank's Claims of Breach of Implied Covenants of Good Faith and Fair Dealing

New York endorses the general rule that every contract includes an implied covenant of good faith and fair dealing. *See New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318, 662

N.E.2d 763 (1995); *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289 (1995).

Sometimes that general rule is misinterpreted, as though it forbids anything that one contracting

party might do that is mean-spirited or that is contrary to the economic interests of an opposing

party.  The implied covenant of good faith and fair dealing actually has a narrower scope.  It

requires that "neither party will do anything which will have the effect of destroying or injuring

the right of the other party to receive the fruits of the contract, that one party will not

intentionally and purposely do anything to prevent the other party from carrying out the

agreement on that party's part, and that an innocent party will be protected from overreaching

adversaries."  22A *N.Y. Jur. Contracts* § 423.

        The implied covenant of good faith and fair dealing is breached where "a party to a

contract acts in a manner that, although not expressly forbidden by any contractual provision,

would deprive the other party of the right to receive the benefits under their agreement."  *Jaffe v.

Paramount Commc'ns*, 222 A.D.2d 17, 22–23, 644 N.Y.S.2d 43 (1st Dept. 1996).  "Good faith

performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose

and consistency with the justified expectations of the other party . . ."  Restatement (Second) of

Contracts § 205, cmt. a (1981).

        "Subterfuges and evasions violate the obligation of good faith in performance even

though the actor believes his conduct to be justified."  *Id.*, cmt. (d).  Transactions that lack

economic substance or that elevate form over substance, and that merely represent efforts to

undermine another party's contract rights, are prime examples of matters that may constitute

breaches of the implied covenant of good faith and fair dealing.  *See Fleet Capital Corp. v.

Yamaha Motor Corp.*, No. 01 Civ. 1047 (AJP), 2002 U.S. Dist. LEXIS 18115, 2002 WL

31174470 (S.D.N.Y. Sept. 25, 2002) (direct payment of proceeds to debtor's vendor, in effort to

defeat lender's superior rights to proceeds received by the debtor, violated the implied covenant of good faith and fair dealing in an intercreditor agreement); *N. Hill Funding of N.Y., LLC v. Amincor Other Assets, Inc.*, Index No. 653092/14, 2016 N.Y. Misc. LEXIS 4922 (Sup. Ct. Jan.17, 2016) (looking to the "economic substance" of transactions and finding that an assignment of assets was improperly designed to frustrate the priority rights of another creditor); *Vista Outdoor Inc. v. Reeves Family Trust*, 234 F. Supp. 3d 558, 567 (S.D.N.Y. 2017), *reconsideration denied*, 16 Civ. 5766, 2017 WL 1094568 (S.D.N.Y. Mar 10, 2017), *aff'd*, 725 F. App'x 17 (2d Cir. 2018) (sellers of interests in corporation breached implied covenant of good faith and fair dealing to purchaser where final sale price was tied to an earn-out based on corporation's post-sale profits, and defendants purchased goods from the corporation for the purpose of artificially inflating profits); *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631–32 (S.D.N.Y. 2010), *aff'd and remanded*, 381 F. App'x 117 (2d Cir. 2010) (summary order) (plaintiff pleaded a valid claim for breach of good faith and fair dealing where lender who could not assign a loan without the borrower's consent instead assigned a 90% participation interest in loan payments, giving the assignee "much of the substance of the [otherwise] forbidden assignment.")

Here, KeyBank asserts breaches of the implied covenant of good faith and fair dealing in two different respects.

First, KeyBank contends that the 2018 modifications to the DIP Facility only provided $15 million of new financing and that the purported $100 million loan was just a ruse pursuant to which the priority rights of the New Money Lenders were elevated above those of the Roll-Up Lenders. Defendants' only response is that this claim allegedly is duplicative of the claims that assert breaches of express contract obligations. I do not agree. The gist of KeyBank's

22

contention is that the defendants engineered a scheme that had no economic substance, under

which they pretended to invoke existing contract rights (the priority rights of the New Money

Lenders in the event of a new financing) when in reality their aim was to deprive the Roll-Up

Lenders of their contractual rights to equal treatment in connection with other transactions that

were planned.  The claim is based on allegations that differ from those that underly the claims for

express breach of contract.  The most closely-related express breach of contract claim is based on

KeyBank's allegations that there were no actual "Net Cash Proceeds" from the new financing;

that claim will succeed or fail regardless of the motives behind the transaction.  The alleged

breach of the implied covenant of good faith and fair dealing, by contrast, is based on the

allegation that the defendants orchestrated a refinancing in the purported amount of $100 million

as a subterfuge and for the sole purpose of trying to evade the Roll-Up Lenders' rights to equal

treatment.  Proof of that allegation requires proof as to the defendants' motives and purposes.

*See, e.g., Aventine Inv. Mgmt., Inc. v. Can. Imperial Bank of Commerce*, 265 A.D.2d 513, 697

N.Y.S.2d 128, 130 (2d Dept. 1999) (holding that a claim for breach of the covenant of good faith

and fair dealing must allege facts tending to show that "defendant sought to prevent performance

of the contract or to withhold its benefits from the plaintiff.")

        If KeyBank's allegations on those points are proved it will have established a breach of

the implied covenant of good faith and fair dealing.  Since proof of the implied covenant claim

would require proof of matters that are distinct from the breach of contract claim, the two claims

are not duplicative of each other.  *See Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552

F. App'x 13, 16 (2d Cir. 2014); *Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of

N.Y. Mellon*, No. 11 Civ. 5459 WHP, 2014 WL 3858469 at *3 (S.D.N.Y. July 30, 2014).

Second, KeyBank argues, in Count III of the First Amended Complaint, that defendants breached an implied covenant of good faith and fair dealing by withholding stock to which KeyBank is entitled and by requiring that KeyBank release its claims against the other Lenders as a condition to receiving stock.  The underlying contract that defendants allegedly are attempting to evade is the DIP Credit Agreement.  KeyBank contends that the defendants have used their control over the buyer to deny KeyBank rights to which it is entitled as a DIP Lender (namely, an equal share of any recoveries, including stock) and to impose self-interested conditions (a release of claims against the defendants) as an unjustified condition to the defendants' performance of their contractual obligations under the DIP Credit Agreement.

Defendants argue in response that the DIP Credit Agreement did not give KeyBank any contract rights with respect to either the equity interests in the buyer or the terms of the Stockholder Agreement that the defendants wish to impose.  *See* Defs.' Mem. at 22.  But the DIP Credit Agreement does plainly entitle all Roll-Up Lenders to their equal and pro-rata shares of any recoveries.  It is true that the DIP Credit Agreement is silent regarding the terms of possible shareholder agreements that might be executed in the event that the DIP Lenders receive stock in another entity.  But the absence of such provisions in the DIP Credit Agreement would not defeat a claim for breach of the implied covenant of good faith and fair dealing if the effect of the Stockholder Agreement was to deprive KeyBank of its right to receive the benefit to which it is entitled under the DIP Credit Agreement.  KeyBank's arguments that the proposed release requirements, and the withholding of KeyBank's stock distribution, are really just bad faith efforts to deny KeyBank's rights under the DIP Credit Agreement (and to add conditions on KeyBank's recoveries that are not set forth in the DIP Credit Agreement) state a valid claim for breach of the implied covenant of good faith and fair dealing.

Accordingly, the motion to dismiss the claims based on implied covenants of good faith and fair dealing is denied.

## IV.  KeyBank's Claims of Tortious Interference with Contract

The parties have cited to New York case law and appear to have agreed that New York law governs KeyBank's claim of tortious interference with contract (or at least that New York law is the same as the law that does govern).  Under New York law a claim alleging tortious interference with contract must plead (i) the existence of a valid contract between plaintiff and a third party, (ii) defendant's knowledge of the contract, (iii) defendant's intentional procurement of a breach of the contract by the third party without justification, (iv) actual breach of the contract, and (v) damages resulting therefrom.  *IMB Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 405 (S.D.N.Y. 2009).  If the defendants have an economic interest in a matter, the plaintiff must allege that the defendant acted maliciously, fraudulently or illegally.  *Id.* at 406.

Defendants argue that they were parties to the DIP Credit Agreement and that one party to a contract cannot be accused of interfering with its own contract or of inducing a breach by another party.  Defs.' Mem. at 23.  But at least one defendant (Franklin Advisors) was not a party to the DIP Credit Agreement.  Furthermore, where contracts involve at least three parties it is permissible for a claim of tortious interference to be made against a tortfeasor who is a party to the contract.  *See Rosecliff v. C3, Inc.*, 94 Civ. 9104 (JFK), 1995 U.S. Dist. LEXIS 6281 at *9, 1995 WL 276156 (S.D.N.Y. May 9, 1995).  Defendants argue that this rule only applies if the tortfeasor is a stranger to the contract, but *Rosecliff* did not impose such a requirement, and neither did the decision on which *Rosecliff* relied.  *See Aljassim v. S.S. S. Star*, 323 F. Supp. 918, 925-26 (S.D.N.Y. 1971) (holding that "the fact that one may derive rights under the same

agreement as two other contracting parties does not excuse tortious interference with their contractual rights").

Defendants also argue that KeyBank's allegations of "malice" are impermissibly conclusory, but that is not the case. Defs.' Mem at 23-24. The First Amended Complaint is quite detailed in describing the objectives that the defendants sought to accomplish, the ways that they accomplished those objectives, and their motivating purposes, *i.e.*, to defeat KeyBank's contract rights. The mere fact that defendants hoped to profit from their actions does not mean that their actions were "justified" as a matter of law and is not enough, at the pleading stage, to overcome well-pleaded allegations of malice and improper intent.

On the other hand, there are far more teeth in defendants' argument that a claim for tortious interference cannot be sustained because there was no breach of contract by the Debtors themselves. Agreeing to a *change* in contract terms is not a *breach* of contract terms. I have explained above that the Debtors' promises not to seek priming liens, in the DIP Credit Agreement and the 2017 DIP Order, were for the benefit of the DIP Lenders as a whole, and that the "Required Lenders" had the contractual right to waive such promises and to agree to modifications on behalf of all of the DIP Lenders. To the extent that the Debtors and the Required Lenders agreed to modifications to which they had the power to agree under the terms of the parties' contracts, those actions cannot properly form the basis of a tortious interference with contract claim.

The same is true of the Debtors' commitment not to seek "material modifications" without the consent of the "Required Lenders" and, if "applicable," the consent of the Prepetition Documentation Agent. Acting *with* the consent the Required Lenders is not a breach of such a promise, and for the reasons set forth above KeyBank's purported rights as Prepetition

Documentation Agent were terminated and in any event are not relevant to its claims as a Roll-Up DIP Lender.

The relevant portion of KeyBank's First Amended Complaint does not allege any other particular contractual promises that the Debtors allegedly violated.  The actions of the Debtors that are challenged (the grant of new priming liens) involved matters about which (contractually) the Required Lenders were empowered to consent, and did consent.

Also troubling is the absence of any contention in the First Amended Complaint that alleged breaches of contract by the Debtors were induced by, or arranged by, or "procured" by the defendants, as opposed to being matters that originated with the Debtors themselves.  The First Amended Complaint merely alleges that the defendants were aware of the Debtors' contract obligations and that by agreeing to the new priming DIP Facility the defendants "interfered" with KeyBank's contract rights.  A tort claim requires an allegation that the defendants did something, without justification, that actually brought about the alleged breach of contract.  No such allegation appears in the First Amended Complaint.

Accordingly, the claim alleging tortious interference with contract will be dismissed.

## V.    Alleged Breaches of Fiduciary Duty

KeyBank contends that the defendants, as shareholders in the entity that bought the Appvion assets, have violated fiduciary duties by refusing to distribute the stock to which KeyBank is entitled unless KeyBank first agrees to release the claims that it has asserted in this case.  Am. Compl. ¶ 133.  It has also alleged that Franklin Advisors has aided and abetted this breach of fiduciary duty.  *Id.* ¶ 148.

Defendants argue that KeyBank is not presently a shareholder of the entity that bought the Appvion assets and therefore that no fiduciary duties are owed to it.  But KeyBank has properly alleged that it has a present legal entitlement to the stock certificates.  That right is

22

attributable to its status as a DIP Lender.  This is not a situation in which a stockholder is

attempting to file suit based on actions that took place at a time when the stockholder had neither

actual nor beneficial ownership of any shares, which is the situation that the Delaware Court of

Chancery addressed in the decision cited by defendants.  *See In re Transkaryotic Therapies, Inc.*,

954 A.2d 346, 371 n. 112 (Del. Ch. 2008) (noting that a shareholder cannot challenge actions

that took place when it held no shareholder rights, but not addressing the "beneficial" ownership

issue that arises in this case).  KeyBank alleges that it had an entitlement to the receipt of the

stock and that defendants breached fiduciary duties after this entitlement arose, not before.

If (as alleged) the defendants have unilaterally elected to confiscate the shares and to

refuse to deliver them to KeyBank notwithstanding KeyBank's entitlement to them, that hardly

means that KeyBank lacks a beneficial interest in the shares.  *See Law v. Alexander Smith &*

*Sons Carpet Co.*, 68 N.Y.S.2d 143, 144–45 (1st Dept. 1947) (per curiam) (holding that

settlement agreement between widow and executor of husband's estate, which entitled widow to

stock of deceased husband's company, conferred equitable and beneficial ownership of the stock

on the widow).  Furthermore, KeyBank has properly alleged that the defendants have

acknowledged KeyBank's beneficial ownership of the relevant stock.  *See* Am. Compl. ¶ 84-85

("Franklin sent a letter to KeyBank reiterating that . . . [i]f Fifth Third and KeyBank choose not

to execute the Stockholder Agreement, *their equity interests* will be preserved for *their benefit*

pending resolution of whatever open issues remain among the parties.") (emphasis added).  The

First Amended Complaint therefore sufficiently alleges that KeyBank is the beneficial and

rightful owner of the shares and that fiduciary duties are owed to it.

Defendants also argue that the demand for a release was not a breach of fiduciary duty

because there is no merit to KeyBank's underlying claims.  I have held for the reasons stated

above that some of KeyBank's claims have been properly pleaded and survive a motion to

dismiss.  Even if that were not the case, however, the First Amended Complaint properly alleges

that the refusal to deliver stock to which KeyBank was entitled – based on the defendants' self-

interested insistence that they be released from KeyBank's claims – was an abuse of defendants'

control of the buyer that had nothing to do with the buyer's legitimate business interests and that

instead served only the self-interests of the defendants themselves.

Accordingly, the motion to dismiss the claims based on breaches of fiduciary duty is

denied.

## VI.    The Declaratory Judgment Claim

Finally, KeyBank seeks a declaratory judgment of its rights under the various contracts

and as to the amounts to which it is entitled to a ratable share under the various agreements.

Defendants argue that all of these matters will be resolved in connection with KeyBank's other

claims and therefore that the request for a declaratory judgment is surplus and unnecessary.  That

may turn out to be true and if so the request for a declaratory judgment may be dismissed in the

future.  I cannot at this early stage conclude with complete certainty, however, that the

declaratory judgment request serves no possible separate purpose.  The continued presence of the

claim is not prejudicial to any party and so the motion to dismiss it at this stage is denied.

### Conclusion

For the reasons stated above:

1.    KeyBank's claims will be dismissed to the extent that they allege (a) that the

Required Lenders did not have power (no matter what the circumstances) to agree to priming

liens, (b) that priming liens could not be granted without the consent of KeyBank, or (c) that

material modifications could not be agreed upon without the consent of KeyBank.

2.      The motion to dismiss will be denied as to the remainder of KeyBank's breach of

contract claims.

3.      The motion to dismiss will be denied as to all of KeyBank's claims alleging

breach of implied covenants of good faith and fair dealing.

4.      KeyBank's claim alleging tortious interference with contract will be dismissed.

5.      The motion to dismiss will be denied as to KeyBank's claims alleging breach of

fiduciary duty and aiding and abetting breaches of fiduciary duty.

6.      The motion to dismiss will be denied as to KeyBank's request for a declaratory

judgment.

A separate Order will be entered to the foregoing effect, and the parties will be directed

to confer and to submit an appropriate scheduling order governing further proceedings.

Dated: New York, New York
       May 4, 2020

                                        **s/Michael E. Wiles**
                                        HONORABLE MICHAEL E. WILES
                                        UNITED STATES BANKRUPTCY JUDGE